The **DETROIT EDISON COMPANY**, Ralph Wertz, and Herbert Knack, Plaintiffs,

v.

**EAST CHINA TOWNSHIP SCHOOL DISTRICT NO. 3**, Donald MacDonald, Leland Sass, Mary Phillips, Milton J. Gearing, Edwin H. Lindow, Malcolm G. Simons, and William Hopson, individually and as members of the board of education of said school district, Defendants.

Civ. A. No. 25702.

United States District Court
E. D. Michigan,
S. D.

Nov. 5, 1965.

Richard Ford, Fischer, Sprague, Franklin & Ford, Detroit, Mich., for plaintiffs.

John H. Nunneley, Stratton S. Brown, Miller, Canfield, Paddock & Stone, Detroit, Mich., Kenneth J. Stommel, Walsh, O'Sullivan, Stommel & Sharp, Port Huron, Mich., for defendants.

LEVIN, Chief Judge.

Plaintiffs' suit is for a declaration under 28 U.S.C. § 2201 that the annexation of two school districts to the district in which their property is situated is in violation of the federal constitution. They seek a further declaration that the assumption of the large bonded indebtedness of the annexed school districts by the combined larger district is in violation of both the federal constitution and state law.

The court now has before it a motion for summary judgment by defendants on the ground that the federal court has no jurisdiction over the subject matter of the controversy as to any of the plaintiffs or, in the alternative, for judgment as a matter of law on the merits.

Plaintiffs now and for many years have owned land in the East China Township School District No. 3, the "original East China district," located in St. Clair County, Michigan. The district is relatively small in population and area, practically debt free, but has a high assessed valuation because plaintiff Detroit Edison's plant in that district is valued at over 82 million dollars. Adjacent to this district was the Marine City Community School District No. 7, "Marine City district," and the School District of the City of St. Clair, "St. Clair district." These two last named districts had a much larger area and population than the original East China district, a much lower assessed valuation, and were obligated to a large bonded indebtedness incurred through the financing of new high schools. The original East China district paid tuition for its high school students who attended these schools.

Early in 1961, the original East China district annexed the Marine City and St. Clair districts, making the "combined district." Since the annexations, the combined district has operated as an integrated unit, and operating expenses have been assessed uniformly on all property. Propositions that the combined district assume the bonded debt of the former Marine City and St. Clair districts were rejected on several occasions. In July 1964, however, the electors of the combined district voted to assume the high school bonded indebtedness totaling approximately 2.8 million dollars. The result of the assumption was to shift about sixty per cent of this liability to the electors of the original East China district, a considerable portion of which becomes the burden of the plaintiff taxpayer Detroit Edison.

The annexation proceedings were conducted pursuant to the Michigan School Code.[1] This statute provides for annexation by the approval of the following: (1) the State Superintendent of Public Instruction; (2) a majority vote of the board of education of the annexing district (the original East China district);

---

1. C.L.S. 1961 § 340.1 et seq. (Michigan Statutes Annotated § 15.3001 et seq.).

and (3) a majority vote of the qualified electors of each of the annexed districts (the Marine City and St. Clair districts). The statute does not provide for an election by the electors of the annexing district.[2] In Detroit Edison Company v. East China Tp. School District, 366 Mich. 638, 115 N.W.2d 298 (1962), the Michigan Supreme Court held that these annexation proceedings were in accordance with the state law, but it was not presented with, nor considered, the issues in this case—whether the debt assumption conformed to state law and whether the annexation or debt assumption is constitutional.

The annexation is alleged to violate the due process and equal protection of the law provisions of the Fourteenth Amendment because the annexed districts approved it by a direct vote of the electors while the annexing district approved it by a vote of the board of education—an indirect or representative approval of the electors. The debt assumption after the annexation is also said to violate the equal protection and due process provisions of the Fourteenth Amendment because the votes of the numerous electors of the Marine City and St. Clair districts were not separated in the count from the votes of the original East China district and submerged the views of the voters of East China, whose interests were adverse. This, say the plaintiffs, is a destruction and debasement of voting rights.

Plaintiffs contend further that assuming the procedures are constitutionally unassailable, the burden created by the debt assumption is so disproportionate to the benefits that it violates the due process provision of the Fourteenth Amendment.

The parties have discussed in their briefs and oral arguments three aspects of federal jurisdiction: first, whether plaintiffs present a "federal question" and satisfy the jurisdictional amount requirement under 28 U.S.C. § 1331(a), the so-called Federal Question jurisdiction; second, whether the subject matter is within 28 U.S.C. § 1343, the so-called Civil Rights jurisdiction; and third, whether the abstention doctrine applies.

■ Any alteration of municipal boundaries is a matter within the complete discretion of the state and not confined by any rights secured by the federal constitution. Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907). There, the City of Pittsburgh was about to incur a large indebtedness. The City of Allegheny was annexed to Pittsburgh pursuant to a state statute requiring the approval of a majority of all voters, although a majority of the Allegheny voters opposed it. The Supreme Court upheld the annexation and affirmed the general principle as follows:

> Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them. * * * The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state. * * * The state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the constitution of the United States. 207 U.S. 161, 178–179, 28 S.Ct. 40, 46.

---

2. C.L.S. 1961 § 340.431 et seq. (Mich.Stat.Ann. § 15.3431 et seq.).

Recently, the Supreme Court had an occasion to limit this broad language to the specific provisions considered in Hunter—the impairment of contracts and due process. In Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the Court held that a complaint stated a cause of action when it alleged alterations in the boundaries of Tuskegee, Alabama, disenfranchised Negroes in violation of the Fifteenth Amendment. The Hunter rule is not an absolute, the Court said, and must yield to the specific limitation of the Fifteenth Amendment.

Gomillion does not diminish the authority of Hunter in annexation *procedure* cases. The Court specifically characterized the problem as the municipal disenfranchisement of Negroes. In fact, the Court rejected the plaintiff's contention based on the equal protection provision. Both the Fifth and Tenth Circuits have subsequently held that Hunter forecloses a challenge to an annexation procedure based on the equal protection provision. Hammonds v. City of Corpus Christi, Texas, 343 F.2d 162 (5th Cir. 1965), cert. den., 86 S.Ct. 85 (Oct. 11, 1965), affirming 226 F.Supp. 456 (S.D. Tex.1964); International Harvester Company v. Kansas City, 308 F.2d 35 (10th Cir. 1962). State courts have reached a similar conclusion. In School Dist. of City of Lansing v. State Board of Education, 367 Mich. 591, 116 N.W.2d 866 (1962), the Michigan Supreme Court rejected an argument almost identical to that of the plaintiffs here in connection with another provision of the Michigan School Code.

Plaintiffs' main argument is that Hunter v. City of Pittsburgh "is no longer law insofar as it is inconsistent in theory with [the reapportionment cases]." They claim Hunter is the product of an era in which "the constitution was so construed as to exclude from the courts' consideration so-called political questions of electoral district and tax district boundaries." Since Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962), a dilution in voting rights is justiciable under the equal protection clause. Plaintiffs would have the principles established in the reapportionment cases apply to the original East China district annexations.

Much uncertainty surrounds the effect of the reapportionment decisions on local government. A threshold question is whether the equal protection clause applies to *any* municipal problems, even reapportionment of representative legislative bodies.

The Supreme Court has not specifically extended the application of the equal protection clause beyond the composition of state legislatures and justiciability may well be limited to the state. Some lower courts have held that the equal protection clause does not extend to local units of government, e. g., Johnson v. Genesee County, Michigan, 232 F.Supp. 567 (E.D.Mich.1964), others, that it does apply, e. g., Brouwer v. Bronkema, No. 1855, Cir.Ct. Kent County, Michigan, September 11, 1964 (appeal pending), and still others have assumed it extends without fully discussing this issue, e. g., Ellis v. Mayor and City Council of Baltimore, 234 F.Supp. 945 (E.D.Md.1964), aff'd, 352 F.2d 123 (4th Cir. Oct. 11, 1965). One commentator concluded that the equal protection clause probably applies to local general purpose governments but not special purpose local governmental agencies. Weinstein, The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government, 65 Colum.L.Rev. 21 (1965).

The Supreme Court may have resolved the issue in favor of limiting the equal protection clause. Griffing v. Bianchi, 86 S.Ct. 52 (Oct. 11, 1965). A three-judge district court had found the Suffolk County Board of Supervisors completely malapportioned. Although the court declined to act until the political agencies had an opportunity to create an appropriate governing body, it refused to dismiss the complaint because it concluded that the equal protection tests applied to the controversy. The Supreme Court disposed of the appeal with these words: "The motion to dismiss is grant-

ed and the appeal is dismissed for want of jurisdiction." Perhaps the dispute is not over, but it would seem that the Supreme Court does not, at this time, see fit to extend the courts' involvement in this area.

 It is unnecessary for the court to attempt to resolve the fundamental issue, and it is sufficient to note the present uncertainty; for even if the equal protection clause applies to local government reapportionment problems, it does not follow that annexation procedures raise a justiciable issue.

 The right at stake in the reapportionment cases is that, in state representative government, the weight of the vote of a citizen in one electoral district be approximately equal to the weight of another citizen's vote in any other electoral district. A state may not create electoral districts which have a population disparity. But this is the only limitation the cases place upon the legislative power of a state to define political boundaries. They create no constitutional rights in affected citizens concerning the *procedure* for creating or altering these districts. Even where the Court has held electoral district boundaries must be altered, it has failed to establish a specific *procedure* to accomplish this. Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Further, the cases have nothing to do with limited purpose districts, such as school districts. Nowhere has it been suggested that the constitution applies to voting matters in such districts.

The court, having observed that a right to vote or to an equal vote in annexations has never been recognized, notes a comment by Mr. Justice Stewart on the reapportionment cases:

It is important to make clear at the outset what these cases are not about. They have nothing to do with the denial or impairment of any person's right to vote. Nobody's right to vote has been denied. Nobody's right to vote has been restricted. Nobody has been deprived of the right to have his vote counted. * *

The question involved in these cases is quite a different one. Simply stated, the question is to what degree, if at all, the Equal Protection Clause of the Fourteenth Amendment limits each sovereign State's freedom to establish appropriate electoral constituencies from which representatives to the State's bicameral legislative assembly are to be chosen. [Lucas v. Forty-Fourth Gen. Assembly of State of Colorado, 377 U.S. 713, 744, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).]

Far from implying a change in the Hunter doctrine, the reapportionment cases seem to reaffirm it. In Reynolds v. Sims, supra, the leading case in which the Supreme Court held that both houses of a bicameral legislature must be apportioned on a population basis, Chief Justice Warren quoted from Hunter with apparent approval:

Political subdivisions of States— counties, cities or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. As stated by the Court in Hunter v. City of Pittsburgh, 207 U.S. 161, 178 [28 S. Ct. 40, 52 L.Ed. 151], these governmental units are 'created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them,' and the 'number, nature, and duration of the powers conferred upon [them] * * * and the territory over which they shall be exercised rests in the absolute discretion of the state.' 377 U.S. 533, 575, 84 S.Ct. 1362, 1388.

Carrington v. Rash, 380 U.S. 89, 85 S. Ct. 775, 13 L.Ed.2d 675 (1965), cited by plaintiffs, is inapposite. That case involved the absolute denial of the franchise in all state elections which is distinct from the issues here.

Any lingering doubts about the vitality of Hunter in the wake of the reapportion-

ment cases should have been dispelled when the Supreme Court denied certiorari in Hammonds v. City of Corpus Christi, Texas, supra. That case is similar to this one. There it was the annexed district which complained of a deprivation of voting rights under the equal protection clause. The plaintiffs were in an even stronger position than the electors of the original East China district for two reasons. They were not even permitted to express their will indirectly through an elected representative body, and the annexation involved a city and not a limited purpose district. The lower courts dismissed the complaint, relying on Hunter. While the denial of certiorari is, of course, not necessarily an agreement with the opinion below, this denial is significant in light of the Supreme Court's actions in voting cases.

█ The foundation on which the Hunter doctrine has stood for half a century on the issue of annexation procedure is as sturdy as ever. This court holds, therefore, that the school district annexation procedure of the Michigan School Code, which was followed by the original East China district in forming the combined district, is a purely legislative matter. It is not justiciable under the due process or the equal protection clauses of the Fourteenth Amendment to the federal constitution.

█ On the assumption of indebtedness issue, plaintiffs fare no better than on the annexation question, and for the same reasons. Included within the state's power to alter boundaries is the power to increase or decrease the area burdened with existing debt. Laramie County Com'rs v. Albany County Com'rs, 92 U.S. 307, 23 L.Ed. 552 (1875); Attorney General of State of Michigan ex rel. Kies v. Lowrey, 199 U.S. 233, 26 S.Ct. 27, 50 L.Ed. 167 (1905).

The Supreme Court fully considered the state's power to alter municipal debt structure in Laramie County. In that case, the legislature established a new county which included two-thirds of the property of Laramie County. The remaining one-third paid the prior debt of

the entire county, and the court held that it was not entitled to contribution from the property which had been removed to form the new county. The Court said "the legislature possesses the power to divide counties and towns at their pleasure, and to apportion the common property and the common burdens in such manner as to them may seem reasonable and equitable." 92 U.S. 307, 312. During the course of its opinion, the Court may have (in 1875) anticipated the essential problem of the instant suit:

> Cases doubtless arise where injustice is done by annexing part of one municipal corporation to another, or by the division of such a corporation and the creation of a new one, or by the consolidation of two or more such corporations into one of larger size. Examples illustrative of these suggestions may easily be imagined. (1) Consolidation will work injustice where one of the corporations is largely in debt and the other owes nothing, as the residents in the non-indebted municipality must necessarily submit to increased burdens in consequence of the indebtedness of their associates. 92 U.S. 307, 314.

The Court agreed that boundary changes and shifting debt burdens "often present matters for adjustment involving questions of great delicacy and difficulty." However, it concluded that the resolution of these questions is legislative or political and not constitutional.

See also Attorney General of State of Michigan ex rel. Kies v. Lowrey, supra, where a new school district was required to pay the total debts of its larger, predecessor district.

█ The language and underlying theory of these cases foreclose an equal protection clause challenge to debt assumption, even though this provision was not specifically urged there. The reapportionment cases did not alter the rule that burdens created by municipal debt assumption are non-justiciable for the reasons stated previously in regard to the annexations of the Marine City district and St. Clair district. The assumption of

indebtedness is not in violation of federal constitutional guarantees.

Moreover, even if by some stretch of reasoning the equal protection clause applies to the debt assumption, plaintiffs' argument falls. Plaintiffs contend that the former debtor districts (St. Clair and Marine City) and the former debt-free district (original East China) should be required to vote separately on the debt assumption. The reapportionment cases prohibit state-created boundaries from interfering with the equality of each man's vote. A fortiori, the "one-man, one-vote" command applies to direct suffrage such as in the debt assumption. The proposed grouping is no more legitimate than the rejected rural-urban groupings.

Assuming the constitutionality of the voting procedures, plaintiffs allege the benefits conferred by the debt assumption are so grossly disproportionate to the burdens as to amount to a taking of property without due process of law.

 The power of the courts over state taxation is limited. The constitution does not require that benefits be exactly proportional to burdens, nor that every taxpayer actually receive a direct benefit. "[T]here are doubtless many individual cases where the weight of a tax falls unequally upon the owners of the property taxed. This is almost unavoidable under every system of direct taxation. But the tax is not rendered illegal by such discrimination." Union Refrigerator Transit Company v. Com. of Kentucky, 199 U.S. 194, 203, 26 S.Ct. 36, 37, 50 L.Ed. 150 (1905). "[A] state tax law will be held to conflict with the Fourteenth Amendment only where it proposes, or clearly results in, such flagrant and palpable inequality between the burden imposed and the benefit received, as to amount to the arbitrary taking of property without compensation —'to spoliation under the guise of exerting the power of taxing.'" Dane v. Jackson, 256 U.S. 589, 599, 41 S.Ct. 566, 568, 65 L.Ed. 1107 (1921). The test for a tax is "whether the taxing power exerted by the state bears fiscal relation to protec-

tion, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." State of Wisconsin v. J. C. Penney Company, 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940).

Property taxes which have been held to violate the due process clause generally fall into two categories. The first includes assessments for purposes that will improve the value of particular property and from which certain geographical areas could derive no benefit but would assume a heavy tax burden. One example is a drainage district assessment. Myles Salt Company v. Board of Com'rs of Iberia & St. Mary Drainage District, 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916); Thomas v. Kansas City So. Ry. Co., 261 U.S. 481, 43 S.Ct. 440, 67 L.Ed. 758 (1923). The second category includes non-uniform taxation which is arbitrary under the circumstances. Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935).

 Whatever may be the rule with regard to assessments for other purposes, it has never been held that a school tax levied uniformly on all property within the school district fails to provide benefits or can be an arbitrary exercise of the taxing power, regardless of the amount assessed to any single property owner. For "every citizen is bound to pay his proportion of a school tax, though he have no children; of a police tax, though he have no buildings or personal property to be guarded; or of a road tax, though he never use the road. In other words, a general tax cannot be dissected to show that, as to certain constituent parts, the taxpayer receives no benefit." Union Refrigerator Transit Co. v. Com. of Kentucky, supra.

 If Detroit Edison were allowed to show that its school tax burden greatly exceeded its benefits, then every large property owner would have the same right in regard to these basic assessments for the general welfare. School taxes might ultimately become similar

to user taxes. Due process does not require this.

The remedy suggested by Detroit Edison would serve only to aggravate a due process violation if one existed. The sole burden which the court considers in testing a tax under due process is the percentage for which the taxpayer is liable. The absolute amount of the tax is irrelevant, as is the fact that the debt was incurred prior to the taxpayer's liability if the full benefits are still available. If this court were to nullify the annexation and assumption, Detroit Edison would be located in a smaller district and become liable for a substantially larger percentage of that school district's assessments.

Plaintiffs rely on Morton Salt Co. v. City of South Hutchinson, 159 F.2d 897, (10th Cir. 1947). The complaint alleged that a taxpayer would be required to pay 46 per cent of the costs for a water works district which, "when constructed, will neither presently nor in the future, furnish water or any other benefit to plaintiff's property or the nearby dwellings." The court held that assuming indirect benefits existed, the burden may nevertheless be so grossly disproportionate to the benefits that it would violate due process, and the court granted a preliminary injunction pending a trial on the merits. That case is analogous to the drainage line of cases. It cannot be read as implying that a court may weigh the benefits to a taxpayer from school district assessments. In fact, it cites with approval the rule previously quoted from the Union Refrigerator case.

Since the acts of which the plaintiffs complain are not violative of the federal constitution, the court holds that it has no jurisdiction. The following issues may merit a short discussion.

For federal question jurisdiction to attach, the "matter in controversy" must exceed $10,000 exclusive of interest and costs. 28 U.S.C. § 1331(a). The issue is whether the "matter in controversy" in this suit is the value of the property which may be encumbered by the tax or the amount of the tax itself. If the lat-

ter is the appropriate measure, the individual plaintiffs fail to allege the requisite amount.

In an action involving a tax or assessment, the "matter in controversy" is the tax for which the plaintiff is liable. Healy v. Ratta, 292 U.S. 263, 268, 54 S.Ct. 700, 78 L.Ed. 1248 (1934). The plaintiff in that case sued to have a state license fee of $50 on certain businesses declared unconstitutional. The Supreme Court held that the actual tax, not the value of the business affected by the license fee, was the test based on the settled principle governing *property* taxes which is stated as follows:

> It has never been thought that the federal courts have jurisdiction of suits to restrain the collection of a property tax or other money exaction of less than the jurisdictional amount assailed as unconstitutional merely because the penalty for nonpayment, which has not been incurred, exceeds that amount. [citation] The tax, payment of which is demanded or resisted, is the matter in controversy, since payment of it would avoid the penalty and end the dispute.

Plaintiffs argue the value of the property determines the jurisdictional amount "where the action is not to enjoin the collection of a sum claimed to be due as a tax but rather to contest the validity of the proceedings giving rise to the encumbrance of property as the result of tax liens." However, Risty v. Chicago, Rock Island & Pacific R. Company et al., 270 U.S. 378, 46 S.Ct. 236, 70 L.Ed. 641 (1926), on which plaintiffs rely, does not support this contention. The plaintiffs in that case were attacking proceedings which placed their lands in a drainage district thereby subjecting them to assessments for certain improvements. The Court specifically found that the assessments themselves satisfied the jurisdictional amount. The Court's discussion of "the invalidity of the whole proceeding" was directed only to the issue of whether the particular suit was appropri-

ate for equitable relief and ripe for decision.

■■ The applicable standard for jurisdictional amount under 28 U.S.C. § 1331(a) is to be determined under federal law, Horton v. Liberty Mutual Ins. Company, 367 U.S. 348, 352, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961). Therefore, the rule in Michigan that the value of the property determines jurisdictional amount, Fuller v. City of Grand Rapids, Michigan, 40 Mich. 395 (1879), has no bearing in this case.

■ Neither plaintiffs Ralph Wertz nor Herbert Knack avers the requisite jurisdictional amount. Their complaints arising under 28 U.S.C. § 1331(a) may be dismissed for this additional reason.

Plaintiffs also allege jurisdiction under the so-called Civil Rights jurisdiction of the federal courts, 28 U.S.C. § 1343 (3).[3] The statute, in pertinent part, provides for district court jurisdiction to redress the deprivation of constitutional rights by those acting under color of state law.

Civil Rights jurisdiction contains no requirement that any necessary amount be in controversy. Plaintiffs state "at this time the chief importance of the subject is that it supplies a second ground for the court's jurisdiction and obviates any dispute as to jurisdictional amount."

If the issue in this case were a pure voting question, there can be no doubt that reliance on 28 U.S.C. § 1343(3) would be proper. Jurisdiction in the reapportionment cases themselves is based on this section, e. g., Baker v. Carr, supra. Similarly, if the issue were a pure tax question, Civil Rights jurisdiction would generally be improper, as in the disproportionate burden theory of plaintiffs' case.

■ A mixed issue, such as the voting procedure used in the creation of

tax liability, is much more difficult to decide. A major purpose of Civil Rights jurisdiction is to redress the deprivation of constitutional rights which have no pecuniary valuation. To entertain jurisdiction under 28 U.S.C. § 1343(3) over essentially property claims only because the plaintiff alleges a constitutional deprivation, could lead to a widespread circumvention of 28 U.S.C. § 1331(a) with its jurisdictional amount limitation. Hague v. C.I.O., 307 U.S. 496, 531–532, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). See also Pierre et al. v. Jordan, 333 F.2d 951 (9th Cir. 1964).

■ Finally, on the abstention doctrine, the federal courts in their sound discretion abstain from entertaining jurisdiction when interests of public policy would be served thereby and when the state involved provides an adequate and appropriate remedy in law or equity. Great Lakes Dredge & Dock Company et al. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943).

■■ The doctrine is applied, as often as not, depending on the particular public policies involved and the particular state remedy available. For example, the federal courts will generally abstain from holding a state statute unconstitutional until the state courts familiar with the local law have had an opportunity to construe it. Alabama State Federation of Labor, etc. v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). This is necessary for harmonious federal-state relations; but when important Civil Rights questions are raised and the state law is neither ambiguous nor in issue, the federal courts often accept jurisdiction. See Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (teacher loyalty oath); McNeese v. Board of Education, 373 U.S. 668, 673, 83 S.Ct. 1433, 10 L.Ed.2d 622 (school segregation); Harman v. Fors-

---

3. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: * * * (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;"

senius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (poll tax).

When claims regarding the fiscal operations of states or their subdivisions are presented, federal courts have usually applied the abstention doctrine. The public policy considerations are generally "[t]he scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts" and specifically the avoidance of "[i]nterference with state internal economy and administration." Great Lakes Dredge & Dock Company et al. v. Huffman, supra, 298, 63 S.Ct. 1073.

This practice of declining jurisdiction in fiscal matters was codified by Congress in the Johnson Act, 28 U.S.C. § 1341, which provides:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

Although the Act speaks only of suits for coercive relief, the Supreme Court is "of the opinion that those considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure." Great Lakes Dredge & Dock Company et al. v. Huffman, supra, 299, 63 S.Ct. 1073.

While the plaintiffs urge various constitutional claims, the court cannot close its eyes to the relief sought. This is a tax case. The court has been presented with no consideration of policy and no exceptional circumstances which should make the abstention doctrine inapplicable. In fact, plaintiffs urge a construction of the Michigan School Code, Section 444, which would be a basis for the ultimate relief they seek—relief from the tax burden. C.L.S. 1961 § 340.444 (Mich. Stat.Ann. § 15.3444).

 Before the doctrine can apply, the state imposing the tax burden must provide a "plain, speedy, and efficient" remedy in the state court. The Sixth Circuit has determined that Michi-

gan does provide an adequate remedy to attack improper taxation within the meaning of the abstention doctrine. Helmsley v. City of Detroit, 320 F.2d 476 (1963); Wyandotte Chemical Corp. v. City of Wyandotte, 321 F.2d 927 (1963). Plaintiffs' remedy is not limited to quo warranto. C.L. 1948 § 211.53 (Mich.Stat. Ann. § 7.97). Therefore, even if a proper jurisdictional basis existed, this court in the proper exercise of its discretion should decline jurisdiction.

To summarize: the acts of which plaintiffs complain do not abridge any substantive rights secured to them by the federal constitution. The individual plaintiffs' suits do not meet the jurisdictional amount requirement in 28 U.S.C. § 1331(a) and are not within the scope of 28 U.S.C. § 1343(3); and even if the plaintiffs have a valid constitutional claim, this suit comes within the abstention doctrine.

An order is being entered dismissing the complaint.