**GWINN AREA COMMUNITY SCHOOLS, a Michigan governmental body; Derek Swajanen, by Donald Swajanen, his Next Friend; Dr. Allen Ahola, individually as a taxpayer and property owner; Bark River-Harris Schools, a Michigan governmental body; Jason Wanic, by Lawrence Wanic, his Next Friend; and Gerald Sundquist, individually as a taxpayer and property owner, Plaintiffs,**

v.

**STATE OF MICHIGAN; State Board of Education, and Phillip E. Runkel, Superintendent of Public Instruction; United States of America; United States Department of Defense, and Caspar W. Weinberger, Secretary of Defense; United States Department of Interior, and James Watt, Secretary of the Department of the Interior; the United States Department of Education, and Terrel H. Bell, Secretary of the Department of Education, Defendants.**

No. M82–199 CA2.

United States District Court,
W.D. Michigan, N.D.

Sept. 1, 1983.

---

Dennis Valkanoff, Butch, Quinn, Rosem-urgy, Jardis & Valkanoff, Escanaba, Mich., for plaintiffs.

John Smietanka, U.S. Atty., Grand Rapids, Mich., and Vincent M. Garvey and Ann M. Sheadel, Dept. of Justice, Civil Division, Washington, D.C., Frank J. Kelley, Atty. Gen., State of Mich. by Gerald Young and Paul Zimmer, Lansing, Mich., for defendants.

OPINION

HILLMAN, District Judge.

## I. INTRODUCTION

This is an action for declaratory and injunctive relief challenging, on federal and state statutory and constitutional grounds, the validity of the "equalization formula" contained in the Michigan State School Aid Act of 1979, M.C.L.A. § 388.1621. Under the equalization formula, the State considers "federal impact aid," provided to local school districts affected by certain federal activities pursuant to the Educational Agencies Financial Aid Act, 20 U.S.C. §§ 236–240 (as amended), in determining the amount of state school aid to which local school districts are entitled.

The following matters are now before the court:

1. Motion for summary judgment on behalf of defendants, the State of Michigan, the State Board of Education, and the State Superintendent of Public Instruction;

2. Motion to dismiss on behalf of defendants, the United States Department of Defense, Secretary of Defense Caspar Weinberger, the United States Department of the Interior, and James Watt, Secretary of the Department of the Interior; and·

3. Motion for certification of certain unresolved issues of state constitutional law to the Michigan Supreme Court on behalf of plaintiffs.

In addition, plaintiffs recently filed a motion for preliminary injunction upon which the court heard oral argument in Marquette, Michigan, on July 19, 1983. Having considered the briefs as well as the arguments of counsel, I will now address the pending motions in the order listed above.

## II. DISCUSSION

A. *Facts.*

Gwinn Area Community School District (Gwinn Area), plaintiff in this action, encompasses the K.I. Sawyer Air Force Base. Gwinn Area maintains that for the year 1982–1983, 1,902 students, or approximately 63% of the 3,036 students attending schools within the Gwinn Area district, are the children of military and civilian personnel assigned to the Air Force Base. Plaintiff, Bark River-Harris School District (Bark River-Harris), encompasses the Hannahville Indian Community, predominantly occupied by the Potawatomi Indians. Bark River-Harris maintains that 39 of the 726 students attending its schools, or about 5% of the total enrollment, reside on the reservation.

Also plaintiffs in this action are Dr. Allen Ahola, Superintendent of plaintiff Gwinn Area, and a property owner within that district, as well as Derek Swajanen, a student from Gwinn Area. In addition, Gerald Sundquist in his capacity as a property owner and taxpayer in plaintiff Bark River-

Harris, and Jason Wanic, a student in Bark River-Harris, are plaintiffs in this action.

Defendants are the State of Michigan, the State Board of Education and Philip E. Runkel, Superintendent of Public Instruction. In addition, the United States Departments of Education, Defense and Interior as well as their respective secretaries, are defendants in this action.

Section 236 of the Educational Agencies Financial Aid Act, 20 U.S.C. § 236 (as amended) (the "Federal Act"), provides that in recognition of the responsibility of the United States for the impact which certain Federal activities have on local educational agencies, financial assistance shall be given to those agencies under certain circumstances. Thus, "federal impact aid," as the funds have been aptly designated, is provided when

"(1) the revenues available to such agencies from local sources have been reduced as the result of the acquisition of real property by the United States; or (2) such agencies provide education for children residing on Federal property; or (3) such agencies provide education for children whose parents are employed on Federal property; or (4) there has been a sudden and substantial increase in school attendance as the result of Federal activities."

20 U.S.C. § 236(1)–(4).

Plaintiff school districts in this action receive federal impact aid pursuant to the provisions of 20 U.S.C. §§ 236–240. In addition, the plaintiff school districts receive state school aid payments from the State defendants, pursuant to the State School Aid Act of 1979, M.C.L.A. § 388.1601, *et seq.* (the "State Act"). Prior to 1974, the provisions of the Federal Act prohibited any state from considering federal impact aid payments in determining state aid to local school districts. 20 U.S.C. § 240(d). However, in the Educational Amendments of 1974, Pub.L. No. 93–380, 88 Stat. 484 (codified at 20 U.S.C. §§ 240(d)(2)), Congress enacted a provision which allows states to consider impact aid payments as "local resources" under state equalization

formulas if it is determined "that such formulas provide appropriate recognition of the relative tax resources per child to be educated which are available to local educational agencies." H.R.Rep. No. 93–805, 93rd Cong., 1st Sess. 3, *reprinted in* 1974 U.S.Code Cong. & Ad.News 4093, 4129.

In the instant case, plaintiffs challenge section 21 of the State Act, M.C.L.A. § 388.1621, which provides in part as follows:

"(1) Except as otherwise provided in this act, from the amount appropriated in section 11, there is allocated to each district an amount per membership pupil sufficient to guarantee the district for 1982–83 a combined state-local yield or gross allowance of $328.00 plus $54.00 for each mill of operating tax levied. For purposes of this section, only taxes levied for purposes included in the operation cost of the district as prescribed in section 7 shall be considered operating tax. The net allocation for each district shall be an amount per membership pupil computed by subtracting, from the gross allowance guaranteed the district, the product of the district's state equalized valuation behind each membership pupil and the millage utilized for computing the gross allowance."

The theory of plaintiffs' case is based on the argument that in determining "gross membership state aid," pursuant to section 21(1), the "local" portion of the "combined state-local yield" must include federal impact aid received by local school districts. Plaintiffs maintain that federal impact aid funds "are the equivalent of local revenue and are used for exactly the same purposes by satisfying the operation costs of the District." It is plaintiffs' contention that federal impact aid funds must be included in calculating total aid in view of section 21(3), which provides as follows:

"State equalization allocations to a district shall be adjusted by subtracting therefrom money received under ... 20 USC 236–244, in the same proportion as the total local revenues covered under the state equalization program are to

total local revenues for education in the district, except that not more than $80.00 per pupil in * * * 1982–83, and $160.00 per pupil in 1983–84 shall be subtracted ... Any deductions made under this act shall be consistent with the requirements of ... 20 USC 240 and its regulations."

Plaintiffs stress the fact that in calculating "net state aid calculation per district," pursuant to section 21(1), local revenue is subtracted from the gross allowance guarantee. Under section 21(3), federal impact aid is then ·deducted from the state aid guarantee. Next, according to plaintiffs, the state equalization allocations are reduced by the amount of the federal impact aid deduction.

It is plaintiffs' claim that the state, in failing to consider federal impact aid as local revenue in "the top half of the equation" (i.e., in determining the gross allowance guarantee), while at the same time reducing "state equalized valuation" by the amount of federal impact aid, "shifts the tax burden of educating federally connected students onto the plaintiff school districts." Plaintiffs maintain, in effect, that the amount of federal impact aid deducted from "the lower half of the formula" (i.e., from the state aid guaranty), can be given a value in mills (e.g., one voted mill brings in $67,268). In order to truly equalize the State's formula, contend plaintiffs, a millage which would raise funds equivalent to the amount of federal impact aid deducted from total state aid would have to be levied and included in the top half of the formula (i.e., in determining "gross allowance," before subtracting local revenue). Plaintiffs challenge the State's impact aid deductions for the years 1980–1981 and 1981–1982, and proposed deduction for the years 1982–1983 and 1983–1984.

Plaintiffs claim that the State formula unduly shifts a tax burden to them.[1] In addition, plaintiffs maintain that the State's treatment of federal impact aid violates their equal protection and due process rights guaranteed by the Fourteenth Amendment. The State defendants deny that the State Act violates plaintiffs' constitutional rights. Moreover, the State defendants contend that the equalization formula provides appropriate recognition of the relative tax resources per child, as required by the Federal Act, 20 U.S.C. § 240(d).

Plaintiffs also claim that the United States Departments of Education, Defense and Interior, as well as their respective Secretaries, "are charged by law with the responsibility for determining that federal funds duly appropriated are properly administered and distributed to appropriate local school districts ... as federal impact aid," and that defendants "have impermissibly allowed the State of Michigan to deduct from the impacted School Districts the very benefaction that the federal impact aid statutes were intended to bestow, thereby breaching the congressional obligation imposed on such Defendants to supply funding for education in districts impacted by their activities."

The federal defendants, with the exception of the Secretary and the Department of Education, maintain that they have no responsibility for administering the federal impact aid program and have been improperly named as defendants. The Department of Education and its Secretary argue that plaintiffs have failed to exhaust their administrative remedies and, in any event, pursuant to the provisions of 20 U.S.C. §§ 236–240, these defendants are without any power to provide plaintiffs with the relief which plaintiffs are seeking.

1. Plaintiffs' position in this case with respect to the relationship between the State Act and the Federal Act is somewhat unclear. Plaintiffs do not maintain that the State Act violates the Supremacy Clause of the United States Constitution by conflicting with the requirements of the Federal Act. However, plaintiffs do maintain that the State's equalization formula fails to provide appropriate recognition of the relative

tax resources per child to be educated which are available to local educational agencies, an allegation which, if proved, would directly conflict with the Federal Act. However, such a determination, as will be discussed later, is appropriately made in the first instance by the Secretary of Education through the administrative procedures set forth in 34 C.F.R. § 222.60, *et seq.*

B. *Motion for Summary Judgment.*

The State defendants seek summary judgment, pursuant to Fed.R.Civ.P. 56(c), on all of plaintiffs' claims. Defendants make the following arguments:

1. The plaintiff school districts lack standing to assert a constitutional challenge to the defendant State's equalization formula;

2. The plaintiff taxpayers and students lack standing to assert any claims;

3. The plaintiff school districts have failed to exhaust their administrative remedies under the applicable administrative scheme;

4. The State defendants have properly considered federal impact aid payments in determining the amount of state school aid due the plaintiff school districts, and, accordingly,

(a) consideration of federal impact aid does not unfairly shift a tax burden to plaintiffs; and

(b) section 21 of the Michigan State School Aid Act, M.C.L.A. § 338.1621, does not violate the equal protection or the due process clauses of the Fourteenth Amendment.

I will address the State defendants' arguments in the above sequence.

■ 1. Defendants first maintain that the plaintiff school districts lack standing to assert any constitutional claims against the State defendants. In particular, defendants argue that the equal protection clause of the Fourteenth Amendment has no application to alleged acts of a state committed against its own subdivisions. I agree that the school districts lack standing to assert the constitutional challenges at issue in the present case.

Under Michigan law a school district is an agency of the state created by law for the purposes of promoting education. *See Lansing School District v. State Board of Education,* 367 Mich. 591, 600, 116 N.W.2d 866 (1962). In *Lansing School District,* the Michigan Supreme Court held:

"Unlike the delegation of other powers by the legislature to local governments, education is not inherently a part of the local self-government of a municipality except insofar as the legislature may choose to make it such. Control of our public school system is a State matter delegated and lodged in the State legislature by the Constitution. The policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized with plenary powers to carry out the delegated functions given it by the legislature." 367 Mich. at 600, 116 N.W.2d 866. Moreover, the Court further held that the "plaintiff school district is an agency of the state government and is not in a position to attempt to attack its parent." *Id.*

In this regard, the Supreme Court of the United States has held that a municipal corporation "created by a state for the better ordering of government has no rights under the United States Constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor & City Council of Baltimore,* 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *City of Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); *City of Newark v. New Jersey,* 262 U.S. 192, 43 S.Ct. 539, 67 L.Ed. 943 (1923). *See also, Northwestern School District v. Pittenger,* 397 F.Supp. 975 (W.D.Pa.1975).

The cases cited by the plaintiff school districts in support of their right to bring the instant action are inapposite. In *Shepheard v. Godwin,* 280 F.Supp. 869 (E.D.Va.1968), and *Douglas Independent School District No. 3 v. Jorgenson,* 293 F.Supp. 849 (D.S.D.1968), plaintiff school districts and taxpayers challenged state equalization formulas on the basis of the supremacy clause of the United States Constitution as well as on equal protection grounds. The defendants in those cases never contested the standing of the plaintiff school districts and the district courts never raised the issue *sua sponte.*

I am satisfied, based on the foregoing analysis, that the plaintiff school districts lack standing to pursue constitutional

claims against the State defendants in the instant case.

2. Defendants next contend that plaintiff taxpayers, residents of the impacted school districts, are without standing to maintain this action in view of the alleged fact that these plaintiffs have failed to show any "direct pecuniary injury" affecting their taxes.

I am convinced, however, that plaintiff taxpayers do possess the requisite standing as municipal taxpayers to raise their equal protection and due process claims. In addressing taxpayer standing to challenge governmental action in general, the Supreme Court has distinguished "federal taxpayer standing" from "municipal taxpayer standing." *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Although the interests of a federal taxpayer have been held "too remote, uncertain, and indirect to justify relief and, therefore, must be measured by the test set forth in [*Flast, supra*], a municipal taxpayer is more likely to show a sufficient direct monetary injury to provide a basis for standing." *Northwestern School District v. Pittenger*, 397 F.Supp. at 980. *See Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952); *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *Crampton v. Zabriskie*, 101 U.S. 601, 25 L.Ed. 1070 (1879).

In *Mellon*, the Supreme Court held that the plaintiff taxpayer must show that "he has sustained or is immediately in danger of sustaining some direct injury as the result of [the statute's] enforcement, and not merely that he suffers in some indefinite way in common with people generally." 262 U.S. at 488, 43 S.Ct. at 601.

In the instant case, the plaintiff taxpayers have alleged that the State's equalization formula denies a substantial amount of State aid to the school districts within which the plaintiff taxpayers reside and pay taxes. I find that the plaintiff taxpayers have alleged a "sufficient personal stake in the outcome of the controversy" to afford them standing to pursue the instant action. In addition, I find that the plaintiff students enrolled in the impacted school districts also have standing to pursue this action. *See, e.g., Abington School District v. Schempp*, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963).

3. The State defendants next argue that the plaintiff school district's claims founded on the "equalization" requirements of the Federal Act must fail since plaintiffs have "failed to exhaust their administrative remedies." Defendants maintain that through the Educational Amendments of 1978, Pub.L. No. 95–561, 92 Stat. 2143 (codified at 20 U.S.C. § 240(d)(2)(C)), and its regulatory counterparts, 34 C.F.R. §§ 222.-60–222.69, Congress established specific procedures to be followed by the Secretary of Education in deciding whether a state will be permitted to consider federal impact aid payments in determining state aid, and that these procedures provide an adequate avenue through which local educational agencies may air their objections to the state's proposed equalization formula. Pursuant to these provisions, defendants contend, a hearing on Michigan's request for authorization to consider federal impact aid payments was held in 1980 (for the 1981–82 school year) and in 1981 (for the 1982–83 school year). Defendants maintain that plaintiff, Bark River-Harris, did not appear at either hearing, and that although plaintiff Gwinn Area appeared through its Superintendent, plaintiff Allen Ahola, it offered no relevant testimony challenging the equalization formula set forth in the State Act.

Plaintiffs, on the other hand, argue that the doctrine of exhaustion is not applicable in the instant case since plaintiffs allegedly "have a right to judicial relief in the first instance." Beyond this, however, plaintiffs allege that they did exhaust their administrative remedies. Plaintiffs contend that the "U.S. Department of Education has repeatedly issued its final decisions declaring Michigan eligible to take impact aid into account in determining state aid to local educational agencies, and that further administrative proceedings would have

been futile." Plaintiffs submit that if the court ultimately determines that they have failed to exhaust their administrative remedies, certain "jurisdictional and equitable exceptions" to the general exhaustion requirements should be applied.

■ The general rule is that a plaintiff must exhaust administrative remedies before resorting to judicial review. *FTC v. Standard Oil of California*, 449 U.S. 813, 101 S.Ct. 62, 66 L.Ed.2d 16 (1980); *Myers v. Bethlehem Shipbuilding Co.*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *Robinson v. Dow*, 522 F.2d 855, 857–58 (6th Cir.1978); *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1092 (6th Cir.1981). With respect to the general purposes of the exhaustion doctrine, the Court of Appeals for the Sixth Circuit has held:

> "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise and to correct its own errors so as to moot judicial controversies. *Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17 (1972). By limiting judicial interruption of agency proceedings, the doctrine also promotes a sensible division of tasks between the agency and the courts: parties are discouraged from weakening the position of the agency by flouting its processes and the courts' resources are reserved for review and resolution of those matters where a dispositive solution is unavailable in the administration process. Thus, the doctrine serves interests of accuracy, efficiency, agency autonomy and judicial economy.' *Ezratty v. Comm. of Puerto Rico*, 648 F.2d 770, 774 (1st Cir.1981)."

*Shawnee Coal Co. v. Andrus*, 661 F.2d at 1092.

Although exhaustion of administrative remedies is usually required as a precondition to obtaining judicial review, the doctrine has been limited to certain instances. *See, e.g., White Mountain Broadcasting Co. v. FCC*, 598 F.2d 274, 278 (D.C.Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). Furthermore, the Supreme Court has held that application of the doctrine in each case must be made with a view towards its purposes and the particular administrative scheme involved. *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969).

In the Educational Amendments of 1976, Pub.L. No. 94–482, 90 Stat. 2081 (codified at 20 U.S.C. § 240(d)(1) & (2)), Congress added 20 U.S.C. § 240(d)(2)(c) which directs the Secretary of Education to adopt regulations regarding consideration of impact aid payments by states under their state aid formulas. These regulations were promulgated by the Secretary and are contained at 34 C.F.R. §§ 222.60–222.69. Thereafter, in the Educational Amendments of 1978, Pub.L. No. 95–561, 92 Stat. 2143, Congress added 20 U.S.C. § 240(g) which provides adversely affected local educational agencies with the opportunity for a hearing in accordance with Chapters 5 and 7 of the Administrative Procedure Act, 5 U.S.C. §§ 501, *et seq.* and 701, *et seq.*

Pursuant to the Secretary's implementing regulations, 34 C.F.R. §§ 222.60–222.69, local educational agencies are provided with an avenue through which to air their contentions that the state has improperly considered impact aid payments in determining relative financial resources. The regulations provide that a submission by a local educational agency under this section must be made in the manner requested by the Secretary and must contain such information and assurances as may be required by the Secretary in order to reach a determination. 34 C.F.R. § 222.69. Section 222.69(b), entitled "Notice and Opportunity for Hearing," provides as follows:

> "*Requests for hearing.* (1) A State or local educational agency which is adversely affected by a determination under section 5(d) of the Act and this subpart and which desires a hearing regarding that determination must submit a written request for a hearing within 30 days after the Secretary gives appropriate notice. The time within which a re-

quest must be filed will not be extended unless the time for filing the request is extended in writing by the Secretary or the Secretary's designee at the time notice of the determination is given."

Pursuant to section 222.69(b)(2), a request for a hearing must "specify the issues of fact and law to be considered." Under section 222.69(e), the Secretary may refer the matter in controversy to a hearing officer or to a hearing panel designated by the Agency. Subpart (f)(1) provides:

*"Procedural rules.* (1) If in the opinion of the hearing officer or panel no dispute exists as to a material fact the resolution of which would be materially assisted by oral testimony, the hearing officer or panel shall afford each party to the proceeding an opportunity for presenting its case at the option of the hearing officer or panel (i) in whole or in part in writing or (ii) in an informal conference which shall afford each party sufficient notice of the issues to be considered (where such notice has not previously been afforded).

(2) With respect to hearings involving a dispute as to a material fact the resolution of which would be materially assisted by oral testimony, the hearing officer or panel shall afford each party, in addition to the notice of issues required by paragraph (f)(1)(ii) of this section, the following:

(i) An opportunity for a record of the proceedings;

(ii) An opportunity to present witnesses on the party's behalf; and

(iii) An opportunity to cross-examine other witnesses either orally or through written interrogatories."

Subpart (G) provides that the hearing officer or panel shall make an initial decision based upon written findings, which shall be forwarded to the Secretary who may certify it as a final decision, or modify or reverse it. Thereafter, notice of the

final decision of the Secretary is to be served on all parties to the hearing.

Subpart (h)(2) provides:

"(2) If a State has been finally determined, after notice and opportunity for hearing, to have been taking into consideration payments under the Act in violation of sections 5(d)(1) and (2) of the Act, the Secretary shall terminate payments under the Act to all local educational agencies in that State unless the State provides satisfactory assurances within thirty (30) days after receiving notice of a final decision, that it will restore to all affected local agencies any State aid which was denied the agencies because of those payments."

■ Subpart (h)(3) provides identical sanctions upon a determination by the Secretary that a state has been considering impact aid payments under the Act "in excess of the portion computed under section 222.66 of this subpart." [2]

■ As stated previously, 20 U.S.C. § 240(g) affords adversely affected local educational agencies the procedural protections of the Administrative Procedures Act, 5 U.S.C. §§ 501, *et seq.* and 701, *et seq.* The jurisdiction of federal courts to review agency action under the APA is found in 28 U.S.C. § 1331. *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Pursuant to 5 U.S.C. § 704, the scope of review of federal courts is limited to those agency actions which are "made reviewable by statute" or which are "final." This statutory prerequisite is not a jurisdictional requirement, however, but "an exhaustion of remedies requirement, subject only to a few carefully limited exceptions." *See Dresser Industries, Inc. v. United States,* 596 F.2d 1231 (5th Cir.1979).

■ Exceptions to the exhaustion doctrine generally arise when "pursuit of administrative remedies does not serve the purposes behind the exhaustion doctrine."

---

**2.** I am convinced that the sanctions contained in 34 C.F.R. § 222.69(h)(2) & (3) were intended by Congress and by the Secretary to be the means by which states are encouraged to re-

evaluate formulas determined by the Secretary to conflict with the equalization requirements of the Act.

*Shawnee Coal Co. v. Andrus*, 661 F.2d at 1093. Thus, the Court of Appeals for the Sixth Circuit has recognized exceptions to the usual exhaustion requirement where "administrative remedies are inadequate or not efficacious, *see Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1081 (D.C.Cir.1978); where pursuit of administrative remedies would be a futile gesture, *see Porter County Chapter of the Izaak Walton League of America, Inc. v. Costle*, 571 F.2d 359, 363 (7th Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 130 (1978); where irreparable injury will result unless immediate judicial review is permitted, *Rhodes v. United States*, 574 F.2d 1179, 1181 (5th Cir.1978); or where the administrative proceeding would be void, *see Winterberger v. Teamsters, Local Union 162*, 558 F.2d 923, 925 (9th Cir. 1977)."

*Shawnee Coal Co., supra* at 1093.

I find that the plaintiff school districts are not entitled to seek relief without first exhausting their administrative remedies through the very specific regulatory channels established in 34 C.F.R. §§ 222.-60–222.69. Plaintiffs maintain that they did, in fact, pursue administrative relief before initiating the instant action. Plaintiff Gwinn Area contends that through its superintendent of schools, it attempted to follow the requisite procedures in order to contest the Secretary's decision to allow the defendant State of Michigan to subtract federal impact aid in determining state aid, but have been continually denied a remedy by the Commissioner." Plaintiffs list various meetings attended by Superintendent Ahola beginning in March, 1979, when Ahola attended an "impact aid hearing" in Washington. In March, 1980, Ahola testified before a Presidential Commission reviewing impact aid.

Plaintiff Gwinn Area has submitted a letter to the court from Allen Ahola to the U.S. Department of Education informing the Secretary of Gwinn Area's "intent to appeal" the State of Michigan's "effort to consider PL 874 payments as a deduct against state aid under the Equalization Formula." In addition, plaintiff has submitted a document containing Gwinn Area's objections to the equalization formula. A response from the Secretary was sent to Gwinn Area on August 25, 1980, revealing that what Gwinn Area intended to appeal was, in fact, not a final decision of the Secretary, but a "draft report" circulated "to give all affected parties an opportunity to correct any errors of fact or interpretation in the report." Accordingly, the Secretary characterized plaintiff's letter as "comment on the draft report." The Secretary's letter closed by stating "[i]f you wish me to consider your August 13, 1980 letter as the basis for a formal hearing let me know." There is no indication that plaintiff ever made such a request following the Secretary's letter. In fact, a letter from Superintendent Ahola to the Secretary reveals that a meeting subsequently took place between Ahola and William Stormer, Director of the Division of Impact Aid, and that Stormer "helped clarify" some of Ahola's questions regarding Michigan's equalization formula.

In April, 1981, plaintiff school districts received notice that a hearing on the defendant State's request to include impact aid funds in its school equalization funding program in 1981–82 would be held on April 24, 1981.[3] A transcript of the hearing conducted in Lansing before Robert Hornberger reveals that no representative from plaintiff Bark River-Harris appeared. While Superintendent Ahola appeared on behalf of Gwinn, when asked whether he wanted to offer any testimony, Ahola said

---

3. Pursuant to 34 C.F.R. § 222.68, a "predetermination" hearing may be conducted, and may be initiated by the State as follows:

"§ 222.68 *Submissions and consultations.*

(a) *Initiation.* (1) A proceeding under this subpart leading to a determination by the Secretary as to whether, or the extent to

which a State may take into consideration payments under the Act in determining relative financial resources or need under a program of State aid may be initiated (i) by the State educational agency or other appropriate agency or other appropriate agency of the State ..."

that he did not. Moreover, following the Secretary's 1981 determination, Superintendent Ahola made no request for a hearing within the prescribed 30 days.

A "predetermination hearing" was again scheduled the following year for September 21, 1982, and Ahola submitted a list of objections to the equalization formula. At the hearing, Ahola appeared and testified concerning plaintiff Gwinn Area's objections to the formula. On December 6, 1982, Gwinn Area was notified that the Secretary of Education had approved Michigan's formula for the years 1982–1983. Gwinn Area made no further attempts to challenge that decision. Under the administrative review scheme established in 34 C.F.R. §§ 222.60–222.69, the plaintiff school districts were not "adversely affected" until after the Secretary's determination that the Michigan formula was consistent with the Federal Act. As stated previously, 34 C.F.R. § 222.69(b)(1) provides that:

"A State or local educational agency which is adversely affected by a determination under section 5(d) of the Act ... and which desires a hearing regarding that determination must submit a written request for a hearing within 30 days after the Secretary gives appropriate notice ..."

Thus, plaintiff Gwinn Area failed to exhaust the established remedies contained in the applicable regulations. Plaintiff Gwinn Area was notified on April 18, 1983, that defendant Michigan Department of Education had requested the United States Department of Education to determine whether the State was eligible to deduct impact aid from state aid payments during the 1983–1984 school year. Plaintiff Ahola attended the public predetermination hearing on April 26, 1983. On June 22, 1983, plaintiff Gwinn requested a hearing on the U.S. Department of Education's subsequent decision that Michigan is entitled to consider impact aid payments in its state aid formula. That hearing has not been conducted as of this date. It appears to me that, for the first time, Gwinn Area is correctly following the procedural avenue toward an ultimate resolution of its claims. The exhaustion doctrine was meant to limit judicial interruption of agency proceedings, and to promote a "sensible division of tasks between the agency and the courts...." *Shawnee Coal Co. v. Andrus*, 661 F.2d at 1092.

 Gwinn Area maintains, however, that even if the court finds that the exhaustion doctrine applies and that plaintiffs have inadequately pursued their remedies at the administrative level, their action should be entertained in this court since, as Gwinn Area contends, the Secretary of Education has no jurisdiction to determine the validity of plaintiffs' constitutional challenges to the Michigan education financing system. I have already determined, however, that the plaintiff school districts lack standing to assert a constitutional challenge to the equalization formula. Furthermore, Gwinn Area's contentions are, in effect, a challenge to the jurisdiction of the Department of Education to decide Gwinn's claims. Indeed, it has been held that a litigant may bypass available administrative procedures where there is a readily observable usurpation of power not granted to the agency by Congress. *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). However, the Sixth Circuit has subsequently ruled that the "*Leedom* jurisdiction exception to the exhaustion doctrine is not automatically invoked whenever a challenge to the scope of an agency's authority is raised." *Shawnee Coal Co., supra* at 1093. Rather, "it is a narrow anomaly reserved for extreme situations." *American General Ins. Co. v. FTC*, 496 F.2d 197, 200 (5th Cir.1974). Although the issue of "agency jurisdiction" is raised, the "exhaustion doctrine generally requires that an agency be accorded an opportunity to determine initially whether it has jurisdiction." *West v. Bergland*, 611 F.2d 710, 719 (8th Cir.1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980).

Three criteria have been generally used to determine whether the exhaustion requirement should be waived:

"1) is the agency's jurisdiction conspicuously lacking;

2) will the agency's expertise assist in resolving the jurisdictional issue; and

3) will exhaustion of administrative remedies result in irreparable harm to the plaintiff."

*Marshall v. Burlington Northern, Inc.,* 595 F.2d 511, 513 (9th Cir.1979).

In the instant case, the Secretary of Education is charged with the specific responsibility for determining whether the state's formula is consistent with the statutory requirements of the Federal Act. *See* 34 C.F.R. §§ 222.62, 222.63, 222.64, 222.69. I am satisfied that an initial determination of plaintiffs' contentions that the Michigan formula fails to equalize state aid among school districts will be of substantial assistance in resolving plaintiffs' claims. Although plaintiffs' have alleged irreparable harm will result if this court fails to act, plaintiffs have already requested a hearing before the Secretary of Education. Rather than await the hearing, plaintiffs have filed a preliminary injunction motion, contending that they will be forced to close "late in 1983" should this court not act. As will be further discussed below, I am not satisfied that plaintiffs have shown the requisite elements for the issuance of a preliminary injunction, the effect of which would be to relieve them from participation in the administrative review process. Accordingly, I find that the plaintiff school districts have failed to exhaust their administrative remedies and are thereby precluded from challenging the implementation of the state equalization formula for the school years 1980–1981, 1981–1982, and 1982–1983. With respect to the upcoming school year, I find that the plaintiff school districts are now involved in the administrative review process by the Secretary of Education and must obtain a "final decision" before challenging the Secretary's actions in federal court. 5 U.S.C. § 704.

Inasmuch as I have concluded that plaintiff school districts failed to exhaust their administrative remedies with respect to the Secretary's 1980–1981, 1981–1982 and 1982–1983 determinations and that plaintiffs' case is still pending before the Secretary with respect to the 1983–1984 school year, I need not reach plaintiff school districts' contentions that the State School Aid Act is in conflict with the Federal Act.

However, I have already held that plaintiff taxpayers and students have standing to challenge the constitutionality of the state formula. Accordingly, I will proceed to address the claims of these plaintiffs in the context of the remaining portions of the State defendants' motion for summary judgment.

4. The State defendants next contend that section 21 of the Michigan State School Aid Act, M.C.L.A. § 388.1621, does not violate the equal protection or the due process clauses of the Fourteenth Amendment, by unfairly shifting a tax burden to the plaintiffs.

In their complaint, plaintiffs allege that the state act contains "quasi-suspect" classifications which discriminate against the plaintiff taxpayers and students in violation of the Fourteenth Amendment. Plaintiffs argue that the court should employ "intermediate scrutiny" in examining the state's equalization formula. Plaintiffs maintain that as a class, the students in Gwinn Area and Bark River-Harris possess a unique characteristic "which distinguishes them from the vast majority of Michigan pupils living in poor districts." This classification, according to plaintiffs, is that the instant students "are adversely affected by federal activities." The state aid classification, argue plaintiffs, distinguishes between students who reside in districts receiving federal impact aid and students in districts which do not. In addition, plaintiffs make the following arguments:

"Students in the latter districts receive full credit for the local revenue generated in their district when the state aid guarantee is calculated. Students in the former districts do not receive a state aid guarantee for the impact aid which is equivalent to local revenue in the formula. On the other hand, students in these

districts lose the impact aid when the impact aid is treated as local revenue for the purposes of deduction. It is extremely invidious for the state not to treat impact aid as an amount of local revenue when determining the amount of state aid but then treating it as local revenue when reducing the amount of state aid. As a class, plaintiff school children in such school districts are characterized by a sufficient indicia of suspicion to warrant the Court to impose intermediate scrutiny. The federally affected students constitute a discreet and insular minority of students. The local taxpayers supporting their education are politically powerless to tax the federal property."

Furthermore, plaintiffs claim that the equalization formula does not serve important governmental objectives.

The State defendants, on the other hand, maintain that plaintiffs' claim is based, in effect, on what the Supreme Court has termed "district wealth discrimination," which the Court has described as:

"... a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts...."

*San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Defendants argue that consistent with the Supreme Court's holding in *Rodriguez,* this court should examine the state's equalization formula using a "rational basis test." 411 U.S. at 40–43, 93 S.Ct. at 1300–1302. Defendants maintain that the Michigan school financing scheme has been "carefully developed over a long period of time and is 'a rough accommodation' of interests in an effort to arrive at practical and workable solutions." Finally, defendants claim that within the limits of the equalization formula, the State School Aid Act guarantees every school district a level of support dependent not on the wealth of the district but only on the relative willingness of the taxpayers of the

district to support education as compared to taxpayers of other districts.

When reviewing an equal protection challenge to a state law, the court is required only to "measure the basic validity of the legislative classification." *Barrett v. Indiana,* 229 U.S. 26, 29–30, 33 S.Ct. 692, 693, 57 L.Ed.2d 1050 (1913). As the Supreme Court has held:

"Most laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern."

*New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979).

Under equal protection analysis, legislative classifications must be fair and must treat similarly situated persons alike. In addition, states have broad discretion in formulating classifications "unless the classification is based on a suspect criterion or unless the classification affects a fundamental interest." *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). In the absence of a suspect criterion or a fundamental interest or right, the legislative classification must be rationally related to a valid governmental objective. *McLaughlin v. Florida,* 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). However, if it is determined that a particular classification is based on suspect criteria or a fundamental right or interest is involved, the statute can be upheld "only if it is precisely tailored to further a compelling governmental interest." *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

A third standard of review, labeled the "intermediate standard," has recently emerged and requires certain legislative classifications, in order to be valid, to "serve important governmental objectives and [be] substantially related to achievement of those objectives." *Craig v. Boren,*

# 750

429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

The Supreme Court has repeatedly recognized the vital significance of public education "in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests ..." *Ambach v. Norwick*, 441 U.S. 68, 75–76, 99 S.Ct. 1589, 1593–1594, 60 L.Ed.2d 49 (1979). *See also Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 246, 93 S.Ct. 2686, 2716, 37 L.Ed.2d 548 (1973) (Powell, J., concurring in part and dissenting in part); *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 29–30, 93 S.Ct. 1278, 1294–1295, 36 L.Ed.2d 16 (1973); *Wisconsin v. Yoder*, 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972). Despite this recognition, the Court has held that "[e]ducation, of course, is not among the rights afforded explicit protection under our Federal Constitution." *San Antonio Independent School District v. Rodriguez*, 411 U.S. at 35, 93 S.Ct. at 1297. *See also Ambach v. Norwick*, 411 U.S. at 77, n. 7, 99 S.Ct. at 1595, n. 7 ("As *San Antonio Independent School Dist. v. Rodriguez* recognized, there is no inconsistency between our recognition of the vital significance of public education and our holding that access to education is not guaranteed by the Constitution.") Furthermore, the Court has concluded that "the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause." *San Antonio Independent School District, supra* 411 U.S. at 30, 93 S.Ct. at 1295.

In *San Antonio School District v. Rodriguez, supra*, the plaintiffs challenged a state formula for public schools which was based, in substantial part, on local property taxes. 411 U.S. at 1, 93 S.Ct. 1278. Because of large interdistrict disparities in per pupil expenditures which flowed from the differences in taxable property values among the school districts, the plaintiffs argued that the state formula for financing education disadvantaged students living in poorer school districts. *Id.* The plaintiffs

urged the Court to find that wealth is a "suspect classification," and that education is a "fundamental right." *Id.* at 18, 93 S.Ct. at 1288.

The Court declined to apply "strict scrutiny" to those students residing in school districts with less taxable wealth than other districts, finding that:

"[t]he system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."

*Id.* at 28, 93 S.Ct. at 1294. After concluding that education "is not among the rights afforded explicit protection under our Federal Constitution," the Court reasoned:

"Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where—as is true in the present case—no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process."

*Id.* at 35, 37, 93 S.Ct. at 1297, 1299.

 I find that the statute in the instant case does not identify a "suspect classification" or burden a "fundamental interest." Moreover, I am satisfied that the State's "equalization formula," does not operate to violate plaintiff taxpayers' and students' equal protection rights since section 21 is "rationally related to a valid governmental interest." *McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964).

Michigan schools are funded by local and state tax revenues. The State operates

educational facilities through local agencies known as school districts. These school districts "differ in numerous ways including population, number of school children, geographic size, wealth and property tax rates." *See Lafayette Steel Co. v. City of Dearborn*, 360 F.Supp. 1127 (E.D.Mich. 1973). Under the State Act, M.C.L.A. § 388.1601, *et seq.*, school districts receive "general membership aid," and "categorical aid." M.C.L.A. §§ 388.1631, *et seq.* Plaintiffs challenge only the formula computing general membership aid. Defendants maintain that pursuant to section 21 of the State Act, the amount of general membership state school aid payable to a school district is determined by three factors:

a) membership (number of pupils enrolled);

b) state equalized valuation of the assessable property in the district divided by the number of pupils or SEV per pupil; and

c) the millage rate levied by the district.

As stated previously, section 21 of the State Act provides each school district with an "amount per membership pupil." Total general membership state aid is then computed by multiplying the amount guaranteed per pupil by the total number of pupils in the district. For example, for the 1981–1982 school year, section 21 guaranteed each district "a combined state-local yield or gross allowance of $360.00 plus $50.55 for each mill of operating tax levied...." Stated differently, section 21 guaranteed each district $360.00 plus $50.55 multiplied by the millage rate per pupil. From this amount, which section 21(1) labels "gross allowance," is subtracted "the product of the district's state equalized valuation behind each membership pupil and the millage utilized for computing the gross allowance," in other words, the local revenue raised per pupil. The difference between the gross allowance and local revenue is the amount of state aid.

Defendants' brief contains an example of the operation of section 21(1) given a school district which levied 30 mills:

"[A] district levying 30 mills was guaranteed $360.00 per pupil plus $50.55 multiplied by 30 ($1,516.50), or a total of $1,876.50 per pupil. If the local school district's SEV per pupil were $20,000, the district would generate $600.00 in local revenue ($20,000 times 30 mills). The state would, thus, provide $1,276.50 in state school aid per pupil ($876.50 – $600.00). If the district had 100 membership pupils, total general membership state aid would be $127,650 ($1,276.50 × 100). If the district had 1,000 pupils, total state aid would be $1,276,500."

Accordingly, the formula contained in section 21(1) determines the amount of state aid to a particular district and, in doing so, subtracts the product of the district's total SEV and its millage rate. Based on the affidavit of Ralph Meyer, Supervisor of the Program Control Unit for the Michigan Department of Education, in 1981–1982 the Gwinn School District had a total SEV of $66,571,969, and levied a millage of 21.7194 mills. Thus, a local revenue of $1,443,731 was generated.

As defendants argue, increases in the number of pupils within a particular district have no effect on the amount of local revenues. Rather such increases are funded by increased state school aid payments. Defendants offer the following example:

"To illustrate, in 1981–1982 the Gwinn school district had 3,351 membership pupils, of which 1,893 were federally connected and 1,458 were not. The district was guaranteed $1,457.92 per pupil [$360.00 + ($50.55 × 21.7194 mills)]. If the district had no federally connected students, state aid would have been calculated as follows:

Guarantee: $1,457.92 × 1,458
| | | |
|---|---|---|
| pupils | = | $2,125,647 |
| Less local revenue | = | 1,443,731 |
| Total general membership state aid | = | $ 681,916 |

Counting the federally connected pupils in membership, Gwinn's actual state aid was calculated as follows:

Guarantee: $1,457.92 × 3,351
| | | |
|---|---|---|
| pupils | = | $4,885,490 |
| Less local revenue | = | 1,443,731 |
| Total general membership state aid | = | $3,441,759" |

Defendants point out that in addition to the state aid, the plaintiff school districts received federal impact aid, pursuant to 20 U.S.C. §§ 236–240, during the years in question. Pursuant to section 21(3) of the State Act, the State is required to subtract a portion of a district's federal impact aid from the state equalization allocation "in the same proportion as the total local revenues covered under the state equalization program are to total local revenues for education in the district, except that not more than $80.00 per pupil in 1982–83, and $160.00 in 1983–84 shall be subtracted."

According to the affidavit of Ralph Meyer, based on the above formula, the state was authorized in the 1981–82 school year to deduct 85.12% of the total federal impact aid from state aid. Thus, since federal impact aid to Gwinn in 1981–82 was $1,606,060.06, the maximum possible deduction for federal impact aid in 1981–1982 was $1,367,078.20 (or $1,606,060.06 × 85.12%). According to Meyer's affidavit, the State actually deducted only $133,720. Thus, Gwinn retained $1,233,358 in federal impact aid funds.

Plaintiffs argue, however, that the amount of federal impact aid deducted from state aid can be equated with a certain value in mills and considered as local revenue in "the top half of the equation," (i.e., in determining the gross allowance guarantee of state aid). In order to truly equalize the State's formula, contend plaintiffs, a millage which would raise funds equivalent to the amount of federal impact aid deducted from total state aid would have to be levied and included in the top half of the formula (i.e., in determining gross allowance state aid) before subtracting local revenue.

Such a formula, argue plaintiffs, would place a district affected by federal activi-

ties on the same level as a comparable district "raising a millage rate comparable to the actual millage rate represented by what the federal impact aid would otherwise represent." Plaintiffs contend that by failing to include federal impact aid as local revenue in determining the gross allowance guarantee, while at the same time reducing "state equalized valuation" by the amount of federal impact aid, defendants have shifted "the tax burden of educating federally connected students onto the plaintiff school districts."

Despite certain factual disputes pertaining to the actual figures involved in the implementation of section 21(1) and (3) in the school districts in question,[4] I am satisfied that no genuine issue of material fact remains with respect to the validity of section 21(3) under the equal protection clause of the Fourteenth Amendment. In this regard, it is well established that summary judgment should be granted only when no genuine issue of material fact remains to be decided and the moving party is entitled to judgment as a matter of law. *Atlas Concrete Pipe, Inc. v. Roger J. Au & Son, Inc.,* 668 F.2d 905, 908 (6th Cir.1976). Moreover, the purpose of a summary judgment motion is not to allow the court to decide issues of fact, but rather to determine whether there is an issue of fact appropriate for a trial. *United States v. Articles of Device, Etc.,* 527 F.2d 1008, 1011 (6th Cir.1976). When deciding whether genuine issues of material fact exist, the court should view the evidence in the light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir.1962).

First, I am satisfied that section 21(3) of the State Act does not disadvantage plaintiffs by unfairly shifting a tax burden to

---

4. Based upon affidavits filed in support of and in opposition to the plaintiffs' motion for preliminary injunction, the parties differ over the following figures:

1. The amount of Gwinn Area's total projected budget deficit for 1983–84;

2. The total amount of State aid to Gwinn Area per year.

The parties disagree over whether categorical state school aid should be considered as part of the revenue of the school districts.

them. Indeed, pursuant to section 21(1), the State shoulders the burden which flows from the presence of federal activities since State aid per pupil is increased in direct proportion to the number of pupils within a given district, without regard to whether they are "federally connected." M.C.L.A. § 388.1621(1). In fact, local revenue in the form of property taxes is unrelated to an increase or decrease in the number of federally connected students.

Second, plaintiffs' contention that the State, in computing "gross allowance," must include federal impact aid as a source of local revenue finds no support in the Federal Act and in no way constitutes "invidious discrimination" prohibited by the Equal Protection Clause. As stated previously, the Federal Act was amended in 1974 to allow states to consider federal impact aid in determining the relative financial resources available to local educational agencies "in proportion to the share of local revenues." 20 U.S.C. § 240(d)(2)(B). Under this formula, which has been reproduced in M.C.L.A. § 338.-1621(3) of the State Act, the State could subtract up to 85% of federal impact aid received by the Gwinn Area School District. Pursuant to the formula contained in section 21(1) of the State Act for computing general membership state aid, the cost of educating each student, including federally connected students, is borne by the State. In addition to the State aid, the plaintiff school districts receive federal impact aid, the purpose of which is to supplement local revenues, not substitute for them. *See Shepheard v. Godwin*, 280 F.Supp. 869, 874 (E.D.Va.1968).

The State's decision to subtract a portion of the federal impact aid received by the school districts rationally furthers the legitimate state purpose of off-setting against the costs to the State of paying out additional aid due to the presence of additional students a portion of the federal impact aid paid by the federal government. In view of the fact that I have found no "suspect classification" or "fundamental right," the "relative differences in spending levels" asserted by plaintiffs, even if proved at trial,

would not entitle them to relief under the equal protection clause since section 21(3) is rationally based. *San Antonio School District v. Rodriguez, supra* 411 U.S. at 24, 93 S.Ct. at 1291.

▮ Third, the alleged fact that Gwinn's budget deficit will "soar" if the State subtracts a portion of the federal impact aid is not controlling. To my mind, plaintiffs have failed to allege any facts which, if proved, would establish a causal connection between the deduction of impact aid and the budget deficit. The school district is already receiving state and federal funds, and there is no evidence that Gwinn's financial condition would significantly improve were the State to allow Gwinn to retain the entire amount of its federal impact aid. Plaintiffs' argument, in essence, is that the school districts need more money and, therefore, the State should not be permitted to subtract any of the federal impact aid funds. Under the guidelines of current equal protection analysis, however, it is not the function of this court to strike down the State's decision to defray a portion of the cost of supporting federally connected students by subtracting federal impact aid because the school districts are suffering from a growing budget deficit, absent the existence of a "suspect classification" or a "fundamental right."

Finally, I find that plaintiffs, by virtue of residing in school districts encompassing federal activities, do not constitute a "discrete and insular minority." *United States v. Carolene Products*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). As counsel for plaintiffs revealed at the hearing, there are other school districts in Michigan receiving federal impact aid. Indeed, plaintiffs and others who are similarly situated have none of the "traditional indicia of suspectness," nor are they "saddled with such disability," as to warrant heightened scrutiny under the Equal Protection Clause. *See San Antonio School District v. Rodriguez, supra* 411 U.S. at 28, 93

S.Ct. at 1294; *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).[5]

Plaintiffs also argue that this court's review of section 21(3) should be more exacting since the instant case falls within an exception to the rational basis standard applied in *San Antonio School District v. Rodriguez, supra* at 40, 93 S.Ct. at 1300. Plaintiffs maintain that implementation of the federal impact aid deduction for the 1983–1984 school year will ultimately result in an "absolute denial of educational opportunities" to the students of the plaintiff school districts. I have already determined, however, that the State's decision to subtract a portion of federal impact aid from state aid, and the fact that the school districts' budgets are in financial difficulty are only incidentally related. Furthermore, there is no allegation that were the State to allow the districts to retain the federal impact aid, the districts would not ultimately go bankrupt, in view of the rising deficits. Fed.R.Civ.P. 56.

Accordingly, for the reasons stated, I am convinced that the State defendants are entitled to summary judgment on the federal equal protection claims brought by the plaintiff taxpayers and students.

5. The State defendants next contend that they are entitled to summary judgment on the claims of plaintiff taxpayers and students that section 21(3) of the State Act deprives plaintiffs of their property without due process.

Plaintiffs claim that the State equalization formula contained in sections 21(1) and (3) arbitrarily treats local property taxes in a non-uniform fashion by forcing "in-formula" school districts (i.e., districts eligible for "general membership aid" by virtue of local property taxes which do not generate funds above the state aid guaranty) to levy additional local taxes to make up for the loss of federal impact aid deducted by the State. At the same time, argue plaintiffs, the "out-of-formula" districts (i.e., districts not eligible for general membership aid by virtue of local property taxes which generate amounts above the state aid guaranty) receive all of their allotted federal impact aid since they are not receiving any state aid from which the federal funds could be deducted. According to plaintiffs, this allegedly disparate treatment violates their due process rights.

In addition, plaintiffs claim that their due process rights are violated by the State's equalization formula because deduction of impact aid by the State amounts to a "confiscation" of plaintiffs' property without just compensation.

I find plaintiffs' due process claims to be without merit. With respect to plaintiffs' claim that the State's formula forces "in formula" districts to increase taxes to make up for the loss of federal impact aid deducted by the State, while not forcing "out-of-formula" districts to do the same, the Court of Appeals for the Sixth Circuit has held:

> "The Fourteenth Amendment was not intended to prevent a state or municipality from adjusting its system of taxation and administering its tax laws in all proper and reasonable ways. Absolute equality in taxation is unattainable. A tax is not in conflict with the Fourteenth Amendment unless its imposition clearly results in such flagrant and palpable inequality between the burden imposed and the benefit received as to amount to the arbitrary taking of property without compensation."

*Hudson Motor Car Co. v. City of Detroit,* 136 F.2d 574, 576–77 (6th Cir.1943). Ac-

---

5. Plaintiffs offer no comparative evidence which might show that the equalization formula results in disparate impact upon the plaintiff school districts when viewed along with other school districts. Under the "25% disparity limitation" provided in 34 C.F.R. 222.63(a), the Secretary of Education will consider a program of state aid to be equalized "if the disparity in the amount of current expenditures or revenue per pupil for free public education among local educational agencies in the State is no more than 25 percent for the fiscal year for which a determination is made under this subpart." Plaintiffs have never alleged the Secretary's allowance of Michigan's proposed impact aid deduction failed to consider the percentage of disparity in current expenditures or revenue per pupil between local educational agencies.

*cord: United States v. Smith*, 484 F.2d 8, 11 (10th Cir.1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1973). Moreover, in *Detroit Edison Co. v. East China Township School District*, 247 F.Supp. 296 (E.D.Mich.1965), *aff'd*, 378 F.2d 225 (6th Cir.1967), *cert. denied*, 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 284 (1967), the East China School District annexed two larger districts and assumed the bonded indebtedness of the annexed districts. The plaintiff, a taxpayer within the East China School District, maintained that the benefits conferred by the debt assumption were "so grossly disproportionate to the burdens as to amount to a taking of property without due process of law." 247 F.Supp. at 296. The district court analyzed the plaintiff's claim as follows:

> "The power of the courts over state taxation is limited. The constitution does not require that benefits be exactly proportional to burdens, nor that every taxpayer actually receive a direct benefit. '[T]here are doubtless many individual cases where the weight of a tax falls unequally upon the owners of the property taxed. This is almost unavoidable under every system of direct taxation. But the tax is not rendered illegal by such discrimination.' *United Refrigerator Transit Company v. Comm. of Kentucky*, 199 U.S. 194, 302, 26 S.Ct. 36, 37, 51 L.Ed. 150 (1905) ..."

247 F.Supp. at 303.

 After reviewing plaintiffs' due process claims, I am not persuaded that the State's equalization formula as applied to plaintiffs results in "flagrant and palpable inequality" between the burden imposed upon plaintiffs and the benefit received by them. Plaintiffs maintain that they are burdened by the alleged fact that the deduction of impact aid forces them to pay increased property taxes to "make up the difference." As I have already held, however, the State has equalized its aid to the school districts in question by providing aid based on the number of students in each district, without regard to whether they are "federally connected." The fact that the

State then deducts a portion of federal impact aid in order to defray its costs does not deprive plaintiffs of due process. The Constitution does not require that "benefits be exactly proportional to burdens." *Detroit Edison Co. v. East China Township School Dist. No. 3, supra* at 303. Indeed, plaintiffs have failed to allege any factual basis in their pleadings for their argument that the State's equalization formula results in a need for higher property taxes. Rather, it appears from the documents before the court that the high budget deficits in the plaintiff school districts have caused such a need, and, as stated previously, plaintiffs have failed to allege any factual basis for their argument that the State's equalization formula caused those deficits.

Accordingly, in view of all of the foregoing, summary judgment is hereby granted in favor of the State defendants on the claims of the plaintiff taxpayers and students. In addition, summary judgment is granted in favor of the State defendants on the claims of the plaintiff school districts.

### C. *Motion to Dismiss.*

 Defendants, the United States Departments of Defense, the Interior, and their respective Secretaries, have moved to dismiss plaintiffs' complaint for failure to state a claim upon which relief may be granted. Plaintiffs alleged that these defendants, as well as the United States Department of Education, "are charged by law with the responsibility for determining that federal funds duly appropriated are properly administered and distributed to appropriate local school districts ... as federal impact aid" and that defendants

> "have impermissibly allowed the State of Michigan to deduct from the impacted School Districts the very benefaction that the federal impact aid statutes were intended to bestow, thereby breaching the congressional obligation imposed on such Defendants to supply funding for education in districts impacted by their activities."

The Departments of Defense and Interior and their respective Secretaries maintain that the responsibility for administering the federal impact aid program lies solely with the Department of Education and its Secretary, pursuant to 20 U.S.C. §§ 236, *et seq.* Plaintiffs argue that the Department of Defense and its Secretary, Caspar Weinberger, are "indispensable parties" in view of certain responsibilities which they received by way of the Executive Order No. 12049, March 27, 1978. In addition, plaintiffs maintain that the Department of Interior and Secretary James Watt are "indispensable parties" in view of 20 U.S.C. § 240(d), which requires them to "establish Indian education policy and fund the same."

I find that plaintiffs' complaint fails to state any claims against defendants Departments of Defense and Interior, and their respective Secretaries, upon which relief may be granted. Pursuant to 20 U.S.C. § 236, *et seq.*, the "Commissioner of Education" is given the responsibility for administering the federal impact program. For example, section 237 provides that the Commissioner of Education is charged with determining whether the United States owns federal property within a particular school district, whether acquisition of that property has placed a "continuing financial burden" on that district, and whether the agency should receive compensation for the loss of revenue resulting from federal acquisition of that property. 20 U.S.C. §§ 237(a)(1), (2) & (3). Moreover, the Commissioner is responsible for determining the amount of federal impact aid to which a local education agency is entitled and for distribution of impact aid funds. 20 U.S.C. § 240(d).

The allegations in plaintiffs' complaint are based on the Government's alleged failure to properly administer the federal impact aid program. In view of the foregoing, I find that defendants Departments of Defense and Interior, as well as their respective Secretaries, are not responsible for administration of the federal impact aid program and have been improperly named as defendants in the instant action.

I am also convinced that plaintiffs' claims against the Department of Education should be dismissed in view of the preceding determination that the plaintiff school districts have failed to exhaust their administrative remedies, and that the plaintiff taxpayers and students have failed to state a claim upon which relief may be granted for violation of their rights to equal protection and due process under the Fourteenth Amendment.

Accordingly, for the reasons stated, defendants' motion to dismiss is hereby granted, and plaintiffs' claims against defendants Departments of Defense, Interior and Education, as well as their respective Secretaries, are hereby dismissed.

### D. Motions to Certify and for Preliminary Injunction.

In their motion to certify plaintiffs requested that the court submit certain unresolved questions of state law to the Michigan Supreme Court. While this motion was pending, however, plaintiffs filed a motion for preliminary injunction "enjoining all defendants from enforcing any impact aid deduction for the school years 1982–1983 and 1983–1984 and from implementing in any way the United States Department of Education's findings that Michigan has an equalized school aid formula, pending final determination of this action ..." In view of their motion for preliminary injunction and the alleged necessity of obtaining immediate relief, plaintiffs have withdrawn their motion to certify.

In view of the fact that I have decided to grant defendants' motions to dismiss and for summary judgment, and to dismiss plaintiffs' complaint, I hereby deny plaintiffs' motion for preliminary injunction as moot.

### CONCLUSION

Accordingly, for the reasons stated, the State defendants' motion for summary judgment is granted; the federal defendants' motion to dismiss is granted; and

plaintiffs' motion for preliminary injunction is denied as moot. Plaintiffs' complaint is hereby dismissed with prejudice, except with respect to plaintiff school districts' challenge to the Secretary's determination that Michigan has an equalized school aid formula for the 1983–1984 school year. This claim is dismissed without prejudice so that plaintiffs may complete the administrative review process.

IT IS SO ORDERED.