James R. VANDERGRIFF,
et al., Plaintiffs,

v.

CITY OF CHATTANOOGA,
et al., Defendants.

No. 1:95–CV–293.

United States District Court,
E.D. Tennessee.

March 31, 1998.

O Michael Carter, Lusk, Carter & McGhehey, Chattanooga, TN, James R. McKoon, Baker, Donelson, Bearman & Caldwell, Chattanooga, TN, for plaintiffs.

Michael A. McMahan, Joe E. Manuel, Nelson, McMahan, Parker & Noblett, Chattanooga, TN, for defendants.

## MEMORANDUM AND ORDER

COLLIER, District Judge.

In this action, Plaintiffs challenge the legality and constitutionality of the Chattanooga Storm Water Ordinance ("the Ordinance"). The matter proceeded to trial without a jury on April 23, 1997, and concluded on April 24, 1997. The Court heard testimony from seven witnesses: Tom Scott, Mayor Gene Roberts, Kevin Heston, Robert Day, Jack Marcellis, Daisy Warren Madison, and Peter Yakimowich. Having reviewed the testimony of the witnesses, considered the exhibits introduced at trial, the arguments and pleadings of counsel, and the applicable law, the Court, pursuant to *Fed.R.Civ.P.* 52, now enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Subject matter jurisdiction in this case exists pursuant to 28 U.S.C. § 1331 because this action involves a substantial federal question.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

3. Plaintiffs originally filed this action in the Chancery Court of Hamilton County, Tennessee. Defendants removed the case to this Court pursuant to 28 *U.S.C.* § 1441(b).

4. Plaintiffs are property owners or business entities residing in or operating in the City of Chattanooga. Each of the Plaintiffs has been assessed fees under the Ordinance.

5. The Defendants are the City of Chattanooga ("the City"); the Storm Water Regulations Board ("the Board"), which administers the Ordinance; and Tom Scott, the Manager of the Storm Water Division of the Chattanooga Department of Public Works ("the Manager").

6. The Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, requires a National Pollutant Discharge Elimination System permit ("NPDES permit") for the discharge of "pollutants" from any "point source" into the "waters of the United States." 40 C.F.R. § 122.1(b)(1). Thus, municipalities are required to obtain NPDES permits for discharges from municipal storm sewer systems. 33 *U.S.C.* §§ 1311(e), 1342; *see also* 40 C.F.R. §§ 122.1(b)(1), 122.2, 122.26. The CWA allows states to develop a program for issuing NPDES permits.

7. As a result, Tennessee enacted the Storm Water Management Act ("SWMA"), §§ 68–221–1101 to –1113. The purpose of the SWMA is to "enable municipalities to regulate [storm water] discharges" as required by the CWA. § 1101. Section 1105 empowers "municipalities authorized to provide storm water and flood control facilities" to enact ordinances that govern issuance of and fees for storm water discharge permits. Section 1103 authorizes municipalities to provide storm water and flood control facilities, "provided that the municipality obtains all applicable permits and complies with all applicable state and federal laws."

8. Under the CWA and its associated administrative regulations, part I of the City's NPDES permit application was due on May 18, 1992, and part II was due on May 17, 1993. The City filed part I on May 12, 1992, and part II on May 12, 1993. Therefore, the City's application was time-

ly. The City obtained an NPDES permit on October 1, 1996.

9. The City enacted the Ordinance on September 1, 1993. The Ordinance requires certain entities to obtain a Chattanooga Storm Water Discharge Permit ("CSWD permit") authorizing the discharge of storm waters into community waters, § 31–310, establishes a fee system for the permits, § 31–312, and imposes an "annual storm water charge, fee, or tax," § 31–354.

10. Prior to receiving the NPDES permit in 1996, the City obtained an NPDES permit for discharges from its Moccasin Bend sewer treatment facility, which is a Publicly Owned Treatment Works ("POTW"). In 1988, the State of Tennessee mandated corrective action regarding the City's downtown combined sewer overflow system ("CSO"). Mayor Gene Roberts testified the projected cost of the required remedial measures was $40 million. (Court File No. 57, pp. 103–106).

11. The Ordinance generates approximately $5 million in revenue each year. One-half of the funds collected are used to fund CSO projects and facilities, and one-half of the funds are used for storm water projects. As of June 30, 1996, there was an $11 million surplus in the storm water account. Testimony indicated the surplus related to a $13.1 million bond issue and would be disbursed as necessary to fund construction projects. (Id. at 118, 202). Daisy Warren Madison, Deputy Finance Officer for the City, testified $9.9 million of the surplus is restricted for storm water capital projects, which may include CSO remediation projects.

12. Peter Yakimowich, an engineer and author of the City's "Storm Water Management Service Fee Rate Study," testified there is a "direct correlation" between the amount of storm water running off a particular piece of property and the City's cost of managing its storm water system: "The quantity and rate of discharge determine the size of facilities as well as ... the attendant maintenance associated with those facilities...." (Court File No. 58, pp. 222–23). Yakimowich further testified the underlying basis of the City's fee system is the user's contribution to the cost of the service of storm water management, in terms of impervious areas which impede the infiltration of storm water into the ground, size of the property, and use of the property. (Id. at 218–22).

13. Manager Tom Scott testified he has authority to construe undefined terms and the City has not provided written guidelines or regulations for making such decisions. (Court File No. 57, p. 29). Scott admitted he exercises his own discretion in defining the terms. (Id. at 32).

14. For example, Scott has authority to define the scope and extent of the City's storm water system. The Ordinance imposes a fee on property owners "now served directly or indirectly by the city's storm sewer system." § 31–350. Consequently, Scott has authority to decide who must pay storm water fees and who is exempt. (Id. at 90–91). Scott testified the manner of defining the scope of the City's storm water system is not expressed in written form, and Scott limits the system to areas the City maintains. (Id.). The Court notes, however, the SWMA defines storm water facilities as "the drainage structures, conduits, combined sewers, sewers, and all device appurtenances by means of which storm water is collected, transported, pumped, treated or disposed of." Tenn.Code Ann. § 68–221–1102(6).

15. The 1994 amendment to the Ordinance (Exh. 2) allows the Manager discretion to waive the requirement of a grit sediment basin and oil skimmer structure if similar facilities are or will soon be available in public rights-of-way or when programs implemented at the facility substantially eliminate grit and oil discharges. Scott testified he bases the waiver decision on whether there is a visual discharge of oils and the construction plans of the City. (Court File No. 57, pp. 56–57).

16. Scott has granted every application submitted for a storm water permit. (*Id.* at 45). Exercising his discretion, Scott even granted applications which lacked required information. For example, Plaintiff Vickery Brothers failed to provide required off-site water flow information, but received a permit. (*Id.* at 49–50). Scott testified he assisted Vickery Brothers in the preparation of the application and, based on a visual inspection, Scott determined there was no off-site water flow. Scott also testified Plaintiffs Dayton Boulevard Auto Repair and Clean–Up Shop ("Dayton Boulevard") and Gold Bond, Inc. received permits even though their applications lacked off-site water flow information, but noted he could determine there was no off-site water flow from looking at the maps submitted with the application. (*Id.* at 50–54). Scott admitted there was no provision in the Ordinance authorizing waiver of the off-site water flow application requirement. (*Id.* at 88). Scott further admitted a new Manager could follow different subjective standards and criteria in deciding whether to exercise discretion and grant waivers. (*Id.* at 59–60).

17. A dispute arose between Scott and the Board over whether the term "forest," which is not defined in the Ordinance, encompasses a hay field. The Board determined a hay field may be considered a forest, even though Scott asserted a forest must have "tree vegetation." (*Id.* at 30–32).

18. Scott testified he has instituted nine proceedings in the Chattanooga City Court to enforce the Ordinance. (*Id.* at 79–80). On one of those occasions, Scott issued a notice of violation to Plaintiff Pryor Bacon by certified letter and "took" Bacon to Chattanooga City Court. (*Id.* at 79). The violation related to an oil skimmer. Bacon put in the oil skimmer, reported his action to the court, and the case was dismissed. (*Id.*).

19. Kevin Heston, an environmental consultant, testified some of his clients had received notices to comply with the Ordi-

nance and, as a result, he contacted Scott to obtain a definition of "service stations" and "convenience stores." (*Id.* at 142–43). According to Heston, Scott did not provide criteria for determining whether a car wash is classified as a service station or a convenience store. Heston did not identify any Plaintiff as the concerned client who prompted him to contact Scott.

20. Heston also testified the Ordinance requires oil/water separators with grid chambers, but does not provide any guidelines for determining what size separator is necessary for compliance with the Ordinance. (*Id.* at 146–47). Peter Yakimowich, an engineer, testified the City's Best Management Practices Manual (Exh. 10) has a table that would enable an engineer to design an appropriate separator, given knowledge of the amount of water that would be running through the separator. (Court File No. 58, p. 239). Yakimowich also testified such tables are available to "engineers practicing in the field." (*Id.*).

21. The City built a separator for Plaintiff Vickery Brothers, but not for Plaintiff Dayton Boulevard. Scott testified he required Dayton Boulevard to install a separator because the storm water was discharging to the rear, and he could not install a separator in existing rights-of-way as he had done in other cases. (Court File No. 57, pp. 73–74).

## *CONCLUSIONS OF LAW*

1. The City argues Plaintiffs lack standing. The Court will discuss the standing issue before considering each of Plaintiffs' arguments that the Ordinance is invalid.

2. ***Standing.*** Plaintiffs point out the City stipulated Plaintiffs have standing to assert: (a) the enactment, implementation and/or enforcement of the Ordinance is beyond the powers conferred by the City Charter or the SWMA, (b) the monies collected under the Ordinance represent an unconstitutional tax, and (c) if the Ordinance imposes a fee, rather than a tax, the

fee is an impermissible assessment under Tennessee law. (Exh. 58).

3. With respect to their remaining claims, Plaintiffs contend the United States Court of Appeals for the Sixth Circuit has recognized municipal taxpayer standing. *See Taub v. Kentucky*, 842 F.2d 912, 918 (6th Cir.1988) ("The rule upholding municipal taxpayer standing appears to rest on the assumption that the relatively small number of taxpayers involved and the close relationship between residents of a municipality and their local government results in a direct and palpable injury whenever tax revenues are misused."); *Hawley v. City of Cleveland*, 773 F.2d 736, 742 (6th Cir.1985) (finding municipal taxpayers have standing to enjoin unconstitutional acts that affect public finances); *Gwinn Area Community Schools v. Michigan*, 574 F.Supp. 736, 743 (W.D.Mich.1983) (allowing plaintiffs to assert equal protection and due process claims and holding municipal taxpayer has standing if "he has sustained or is in immediate danger of sustaining some direct injury as the result of [the statute's enforcement], and not merely that he suffers in some indefinite way in common with people generally," *i.e.*, the plaintiff must allege a "sufficient personal stake in the outcome of the controversy").

4. Based upon the cited stipulations and cases, the Court agrees Plaintiffs have standing to raise all claims, except a facial vagueness challenge. As the Court will explain in connection with Plaintiffs' due process claim, the standing problems associated with a facial vagueness challenge are not related to misuse of tax revenues or damage to public finances, and Plaintiffs have not sufficiently alleged a "personal stake" to afford standing.

5. **The City is not empowered to enact the Ordinance under the SWMA and is in violation of the CWA.** According to Plaintiffs, the CWA and the SWMA required the City to possess an NPDES permit before constructing or maintaining storm water facilities. (Court File No. 59, p. 12). Plaintiffs reason the SWMA is the only legal authority enabling the City to pass the Ordinance. Because the City did not possess an NPDES permit when it enacted and began implementing the Ordinance, Plaintiffs contend the Ordinance is void *ab initio*.

6. First, Plaintiffs assert the following language in the Ordinance's preamble acknowledges the permit requirement:

WHEREAS, The City of Chattanooga *is required by federal law*, particularly 33 U.S.C. § 1342(p) and 40 CFR § 122.26, *to obtain a National Pollutant Discharge Elimination System (NPDES) permit* from the Tennessee Department of Environment and Conservation for storm water discharges from the Chattanooga Storm Water System. The NPDES permit *requires* the City to impose controls to reduce the discharge of pollutants in storm water to the maximum extent practicable using management practices, control techniques and system design and engineering methods, and such other provisions which are determined to be appropriate for the control of such pollutants.

(Exh. 1) (emphasis added). Plaintiffs note the preamble refers to the NPDES permit in the present tense, as if the City had obtained the permit before the Ordinance was enacted. Plaintiffs further note § 31–301(b) of the Ordinance provides:

It is further the *purpose of this article to enable Chattanooga to comply with the National Pollution Discharge Elimination System permit (NPDES)* and applicable regulations (40 CFR § 122.26) for storm water discharges.

(Exh. 1) (emphasis added).

7. Second, Plaintiffs argue the SWMA clearly requires municipalities to obtain applicable permits before taking steps to construct and operate storm water facilities. Plaintiffs rely on the following three provisions of the SWMA:

**Authorization of storm water facilities or flood control improvements by municipality.**—The governing body of any municipality may authorize the construction, extension, enlargement, or acquisition of necessary storm water facilities or flood control improvements within its corporate boundaries. The improvements may include, but are not limited to, the extension, enlargement, construction, or acquisition of storm water facilities or flood control improvements; the widening, straightening, or relocating of streams, surface waters, or water courses; and the acquisition, extension, enlargement, or construction of any works necessary to regulate the quantity or quality of water for the protection of streams, water courses, surface waters, life, and property; *provided, that the municipality obtains all applicable permits and complies with all applicable state and federal laws.*

Tenn.Code Ann. § 68–221–1103 (emphasis added).

**Municipal authority.**—(a) In order to protect the public health, municipalities authorized to provide storm water and flood control facilities by this part are authorized by appropriate ordinance or resolution to:

(1) Exercise general regulation over the planning, location, construction, and operation and maintenance over storm water facilities in the municipality, whether owned and operated by the municipality or not;

(2) Adopt any rules and regulations deemed necessary to accomplish the purposes of this part, including the adoption of a system of fees for services and permits;

. . . .

(b) Municipalities may only exercise the authority granted by the provisions of subsection (a) in a manner consistent with *all requirements of state and federal law that apply to such activities. . . .*

Tenn.Code Ann. § 68–221–1105 (emphasis added).

**Permit Conditions for Discharges.**—To the extent practicable, municipalities shall provide permit conditions for storm water discharges associated with industrial activities that are *consistent with any permits issued pursuant to the National Pollution Discharge Elimination System (NPDES),* unless the discharge contains hazardous substances in excess of reporting quantities, or the facility and the municipality are not in compliance with *applicable provisions of the NPDES permits issued to them* for storm water, or the discharge materially affects the municipal storm water facilities through either the quantity of wastewater or its contamination.

Tenn.Code Ann. § 68–221–1110 (emphasis added).

8. Having carefully considered the cited authority, the Court finds Plaintiff's contention without merit. The Ordinance's present tense reference to an NPDES permit does little to support Plaintiffs' argument. The applicable provisions of the SWMA require further discussion. A municipality is authorized to construct storm water facilities under § 1103 if the municipality *"obtains* all applicable permits." Section 1103 does not require the municipality to *possess* or to have *previously obtained* a permit. Section 1105 grants municipalities authority to pass a storm water ordinance "in a manner consistent with all requirements of state and federal law that apply to such activities." It is undisputed the City submitted a timely application for and ultimately received an NPDES permit; therefore, the City's actions were consistent with the requirements of state and federal law. Accordingly, the Court finds the City did not violate the CWA or the SWMA by enacting and implementing the Ordinance before obtaining an NPDES permit.

9. Plaintiffs also contend the Ordinance violates the SWMA because the funds collected are not used exclusively for the construction, extension, enlargement,

or acquisition of storm water facilities as required by §§ 1107(a) and 1103. According to Plaintiffs, the City has used one-half of the revenues generated by the Ordinance to improve the CSO. Plaintiffs argue the CSO is a sewage facility, not a storm water facility, because Tennessee law defines "sewage" as "all water-carried human and household wastes from residences, ... together with such ground, surface, or storm water as may be present." Tenn. Code Ann. § 68–221–101(11). Plaintiffs further argue the NPDES storm water permit does not apply to the CSO because the City has a separate NPDES permit that applies to the CSO and "combined sewer systems that are part of a POTW are excluded from 'municipal storm sewer' under the NPDES separate storm water program regulations." (Court File No. 59, p. 15); see 55 Fed.Reg. 47,990, 48,065 (1990) ("*Municipal separate storm sewer* means a conveyance or system of conveyances ... [w]hich is not part of a Publicly Owned Treatment Works (POTW)....").

10. Defendants point out, however, the SWMA defines storm water facilities as "the drainage structures, conduits, *combined sewers, sewers,* and all device appurtenances by means of which storm water is collected, transported, pumped, treated or disposed of." Tenn.Code Ann. § 68–221–1102(6) (emphasis added). Even assuming the CSO is governed by a separate NPDES permit, it falls within the SWMA's definition of storm water facilities. The existence of a separate POTW permit for a CSO does not override the SWMA's definition of storm water facilities. Therefore, the Court finds there is no evidence the City has used funds collected under the Ordinance for purposes other than the construction, extension, enlargement, or acquisition of storm water facilities as authorized by the SWMA.

■ 11. Plaintiffs further contend the Ordinance violates the SWMA because the revenues generated are not "reasonable in amount" as required by § 1107(a). Plaintiffs assert the City improperly spent one-half of the revenues collected on CSO projects and still had an $11.6 million surplus as of June 30, 1996. Defendants counter the surplus was obtained through bond issues, is a restricted asset which can only be used for storm water capital purposes, and will be disbursed as necessary to fund construction projects. Given the conclusion the CSO falls within the definition of storm water facilities and the evidence proffered by Defendants, the Court finds Plaintiffs have failed to prove the revenues generated are not reasonable in amount.

■ 12. Finally, Plaintiffs argue § 31–345 (providing person violating lawful order of Storm Water Regulations Board shall be guilty of misdemeanor punishable by fine of $25–$500) and § 31–347 (authorizing Manager to institute proceedings in court of competent jurisdiction and declaring person violating Ordinance shall be guilty of misdemeanor) of the Ordinance allow imposition of criminal sanctions, yet the SWMA, § 1106, authorizes only the assessment of civil penalties and fines.

13. Citing *Metropolitan Government v. Allen,* 529 S.W.2d 699 (Tenn.1975), *City of Chattanooga v. Myers,* 787 S.W.2d 921 (Tenn.1990), and *Clark v. Metropolitan Government,* 827 S.W.2d 312 (Tenn.Ct. App.1991), Defendants contend "[c]ases involving violation of city ordinances are not criminal prosecutions; they are civil in nature having as their objects the vindication of domestic regulations." (Court File No. 62, p. 12).

14. In the cited cases, the court viewed a proceeding to recover a fine for violations of a municipal ordinance as a civil action brought by the municipality to recover a debt. *Allen,* 529 S.W.2d at 707; *Myers,* 787 S.W.2d at 928; *Clark,* 827 S.W.2d at 315. None of the cited cases directly address whether a municipality may declare a violation of a municipal ordinance a misdemeanor, nor whether such a declaration should be overlooked. The Court finds the authority cited by Defendants inapposite because the Ordinance

clearly draws a distinction between a misdemeanor, § 31–345, and a civil penalty, § 31–346.

15. Although the SWMA does not authorize imposition of criminal penalties, the City contends it has authority under Tenn. Code Ann. § 6–54–306 to set maximum penalties of thirty (30) days imprisonment and/or monetary penalties ... up to five hundred dollars ($500) for violation of municipal ordinances. Plaintiffs counter, even assuming the City has general authority to define a misdemeanor under § 6–54–306, that general authority cannot supersede the specific authority of the SWMA. Plaintiffs cite *Holder v. Tennessee Judicial Selection Comm'n*, 937 S.W.2d 877, 883 (Tenn.1996), in which the court held: "[W]here there is a conflict between a special statute and a general statute, the special statute will be given effect."

16. The Court perceives no conflict between § 6–54–306 and the SWMA, however. Plaintiffs do not contend the SWMA affirmatively prohibits imposition of criminal penalties. Thus, the SWMA does not specifically prohibit municipalities from imposing criminal penalties; it merely authorizes municipalities to impose civil penalties. Plaintiffs have articulated no other argument that § 6–54–306 does not apply. Therefore, Plaintiffs have failed to convince the Court that the City lacks authority to impose criminal penalties for violation of the Ordinance.

17. *The Ordinance violates Plaintiffs' federal and state due process rights.* Plaintiffs' first substantive due process argument challenges the Ordinance as vague. Plaintiffs argue the ordinance is void for vagueness because it fails to give fair notice of its scope or compliance requirements and delegates unrestricted authority to local officials. Plaintiffs also argue the Ordinance violates the due process right granted by Article I, Section 8 of the Tennessee Constitution because it is vague and conveys broad and undefined power upon municipal officials. Plaintiffs have not identified material differences between federal and state law regarding vagueness doctrine. Therefore, the Court will analyze both claims under the same standard.

18. The United States Court of Appeals for the Sixth Circuit has determined the void for vagueness doctrine serves two primary goals:

First, to ensure fair notice to the citizenry; second, to provide standards for enforcement by the police, judges, and juries.

The requirement that the government write statutes that provide fair notice to those who must obey them is a traditional basis of the vagueness doctrine. "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its application, violates the first essential of due process of law." ...

The second concern, that of minimal enforcement standards, is related to the first. While the first involves notice to those charged with obeying the law, the second part relates to notice to those who must enforce the law.... The standards of enforcement must be precise enough to avoid "involving so many factors of varying effect that neither the person to decide in advance nor the jury after the fact can safely and certainly judge the result."

*Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1104–1105 (6th Cir. 1995) (citations omitted), *cert. denied*, 516 U.S. 1158, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996).

19. Plaintiffs bring a facial and as-applied vagueness challenge. Defendants argue Plaintiffs lack standing to raise a facial challenge.

20. Generally, vagueness challenges to laws not threatening First Amendment interests must be brought on an as-applied basis because a pre-application facial challenge is premature. *National Rifle Ass'n of Am. v. Magaw*, 132

F.3d 272, 292 (6th Cir.1997); *see also Tatum,* 58 F.3d at 1109 n. 6 ("[When a] case does not involve any First Amendment issues, [a party] 'has standing to raise a vagueness challenge only insofar as the statute is applied to his or her specific conduct.' "); *United States v. Avant,* 907 F.2d 623 (6th Cir.1990) (holding that criminal defendant "must show the law is vague as applied to his particular case"); *United States v. McKinnon Bridge Co.,* 514 F.Supp. 546 (M.D.Tenn.1981) (distinguishing vagueness and overbreadth and concluding that statute may only be challenged for vagueness as applied).

21. In *Springfield Armory, Inc. v. City of Columbus,* 29 F.3d 250 (6th Cir.1994), however, the Sixth Circuit found a city anti-assault weapons ordinance unconstitutionally vague on its face. The *Springfield Armory* court applied a "relatively strict" vagueness test because the ordinance imposed criminal penalties and noted a criminal statute may be facially invalid even if it has some conceivable application. The court concluded a certain provision in the ordinance was invalid because it did not give enough information to enable a person of ordinary intelligence to determine whether a desired weapon would fall within the ordinance. *Id.* at 252–53.

22. In *Magaw,* the Sixth Circuit distinguished *Springfield Armory* on several grounds. Among the distinctions, the *Magaw* court noted the court in *Springfield Armory* "did not address the justiciability requirements of Article III." 132 F.3d at 292. The Court finds *Springfield Armory* distinguishable from the instant case on the same ground; because the Ordinance does not implicate the First Amendment, Plaintiffs' facial challenge is premature. Plaintiffs may raise a vagueness challenge only to the application of the Ordinance.

23. The Court will apply the strict test for criminal statutes urged by Plaintiffs (Court File No. 59, p. 17):

As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, ... the more important aspect of vagueness doctrine "is not actual notice, but the other principal element of the doctrine— the requirement that a legislature establish minimal guidelines to govern law enforcement."

*Kolender v. Lawson,* 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted); *see also Dambrot v. Central Michigan Univ.,* 55 F.3d 1177, 1183–84 (6th Cir.1995) ("A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.").

24. Plaintiffs contend several of the Ordinance's terms and requirements are not defined or quantified; therefore, Plaintiffs assert the Ordinance does not give them reasonable notice of whether they are covered, what is required to comply, and what is prohibited.

25. First, Plaintiffs note § 31–310(a) fails to define "service stations and convenience stores" or "vehicular repair and vehicular parts repair shops." Section 31–310 establishes a schedule requiring existing facilities to apply for a CSWD permit:

(1) *Service station and convenience stores* by May 1, 1994;

(2) *Vehicular repair and vehicular parts repair shops* by May 1, 1994;

(3) Industrial, warehousing, and manufacturing facilities by May 1, 1995;

(4) Commercial uses and institutional uses with six (6) or more parking places

north of the Tennessee river by May 1, 1996;

(5) Commercial uses and institutional uses with six (6) or more parking places south of the Tennessee River by May 1, 1997;

(6) Apartments and other multi-family or group residential uses with six (6) or more parking places by May 1, 1998.

(Exh. 1) (emphasis added).

26. Second, Plaintiffs complain § 31–354 imposes an annual fee on the "Transportation, Communication and Utility" land use group at a certain rate, but does not define that group.

27. Third, Plaintiffs point out the Ordinance does not define "reasonable potential" or "pollutants" but § 31–310(c)(8) requires an application for a CSWD permit to show:

For each area of the facility that generates storm water discharges associated with an activity with a *reasonable potential* for containing significant amounts of *pollutants,* a prediction of the direction of flow, and an estimate of the types of pollutants which are likely to be present in storm water discharges associated with an industrial activity.

(*Id.*) (emphasis added).

28. Fourth, Plaintiffs assert § 31–311(b)(7) fails to define "any water quality standard," yet requires:

A Pollution Prevention Plan shall be prepared for the [new] facility. This plan shall demonstrate how the facility will collect, control, and treat storm water so as to control the quantity and quality of storm water leaving the site. The plan shall include as necessary structural controls and non-structural Best Management Practices (BMP) adequate to prevent the violation of *any water quality standard....*

(*Id.*) (emphasis added).

29. Fifth, Plaintiffs note § 31–326 does not define "appropriate proof and records," yet requires:

*Appropriate proof and records* of compliance with the provisions of the Chattanooga Storm Water Discharge Permit ... will be maintained in the office of the designated contact person and be made available for review at any time by the Manager. A copy of the records of compliance will be sent yearly on the anniversary date of the permit to the Manager.

(*Id.*) (emphasis added).

30. Sixth, Plaintiffs assert the Ordinance lacks clear language specifying whether the landowner or the lessee/facility operator is responsible for compliance with the Ordinance. Defendants point out, however, § 31–351 requires "the owner of each lot or parcel which directly or indirectly uses the storm water system maintained by the City [to] pay the storm water fees"; §§ 31–321, 342, and 345 apply to any "person," a term that is defined in § 31–302; § 31–324 regulates "property owners"; and § 31–311 refers to the "owner or developer."

31. Plaintiffs fail to explain how any of these allegedly vague provisions have been applied to any of the Plaintiffs. (Court File No. 59, pp. 16–20). Therefore, Plaintiffs have failed to raise a *de facto* challenge to the Ordinance based on indefinite terms.

32. Moreover, even if the Court assumes Plaintiffs' facial challenge is not premature, it is without merit. According to the Sixth Circuit, "[A] court can find a statute unconstitutionally vague on its face only if the court concludes that it is capable of no valid application." *Magaw,* 132 F.3d at 293 (applying test to federal criminal statute). A facial challenge is also permitted if a law reaches a "substantial amount of constitutionally protected conduct." *Kolender,* 103 S.Ct. at 1859 n. 8. Having carefully considered the challenged terms, the Court finds Plaintiffs have not demonstrated the terms are impermissibly vague in all their applications or that the Ordinance reaches a substantial amount of

constitutionally protected conduct. Therefore, Plaintiffs' facial vagueness challenge fails.

33. With respect to unrestricted delegation of authority, Plaintiffs assert Tom Scott, the City's storm water Manager, has unfettered authority to construe and enforce the ordinance. Because Scott has authority to define the City's storm water system, he determines who is required to pay fees for using the system. Given the SWMA's definition of storm water facilities, the Court finds Scott's discretion to define the City's storm water system is not unfettered. In addition, the Court notes fee assessments may be appealed to the Board under § 31–355 and the Board's decision is subject to "judicial review by common law writ of certiorari" under § 31–365(h).

34. Plaintiffs note Scott has waived certain permit application requirements without authority. The Court cannot conceive how this argument advances Plaintiffs' theory. The waivers obviously benefitted some Plaintiffs by dispensing with certain paperwork. Moreover, the lack of authority to grant waivers reveals there is no provision of the Ordinance that invites arbitrary enforcement in this respect.

35. Plaintiffs also note § 31–310(b) authorizes the Manager to revoke a CSWD permit "for violations of permit conditions, changes in applicable law, or *other good cause.*" (Exh. 1) (emphasis added). Plaintiffs maintain this provision clearly encourages the Manager to engage in arbitrary, discriminatory, and overzealous enforcement. The Court does not find encouragement of arbitrary enforcement within § 31–310(b). That provision requires the Manager to have "good cause."

36. Again, the Court notes Plaintiffs have not explained how the Ordinance has been arbitrarily, discriminatorily, or overzealously enforced against them, nor have they submitted evidence of a threat of such enforcement. Consequently, the Court finds Plaintiffs' vagueness challenge based on unrestricted delegation of power fails.

37. Plaintiffs' second substantive due process theory relies on *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1217 (6th Cir.1992), which recognized "[t]he right not to be subject to 'arbitrary or capricious' action by a state either by legislative or administrative action is commonly referred to as a 'substantive due process right.'" The Sixth Circuit refined this statement by delineating different standards of review for administrative action and legislative action:

> Where a substantive due process attack is made on state *administrative* action, the scope of review by the federal courts is extremely narrow. To prevail, a plaintiff must show that the state administrative agency has been guilty of "arbitrary and capricious action" in the *strict* sense, meaning "that there is no rational basis for the . . . [administrative] decision."
>
> . . . .
>
> Where . . . *legislation* is subject to substantive due process attack, the scope of review by the federal court is . . . even more deferential than for state administrative action. . . .
>
> . . . .
>
> In summary, Fourteenth Amendment substantive due process requires that both state legislative and administrative actions that deprive the citizen of "life, liberty or property" must have some rational basis. Federal court review of the two types of action differs in that in reviewing *administrative* action the federal court must make an extremely limited review of the evidence . . . but in reviewing *legislative* acts, even that is not permitted, the only permissible inquiry . . . being whether the legislation is rationally related to legitimate state . . . concerns.

*Id.* at 1221, 1223 (footnotes omitted).

38. Plaintiffs assert *de jure* and *de facto* arguments by claiming: (a) on its

face, the Ordinance contains numerous arbitrary and capricious requirements and (b) the Ordinance is applied and enforced through arbitrary and capricious conduct on the part of the Manager and other officials empowered to enforce the Ordinance. (Court File No. 59, p. 20). Plaintiffs offer no argument or evidence that convinces the Court the Ordinance lacks a rational basis. Moreover, as the Court's discussion of vagueness doctrine impliedly indicates, *supra* ¶¶ 33–36, the Ordinance does not contain arbitrary or capricious standards, and the Ordinance has not been applied or enforced in an arbitrary and capricious manner. Therefore, Plaintiffs' arbitrary and capricious substantive due process challenge fails.

39. *The Ordinance violates Plaintiff's federal and state equal protection rights.* Plaintiffs contend the Ordinance violates their equal protection rights because (a) on its face, the Ordinance treats Plaintiffs differently than other individuals and entities in like circumstances, and (b) a lack of meaningful standards and guidelines results in the Ordinance being enforced in a discriminatory manner. Plaintiffs identify no material differences between federal and state equal protection law. Therefore, the Court will apply the same standard to both claims.

40. The United States Constitution guarantees, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. amend.* XIV, § 1. According to the Supreme Court, "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). Because there is no fundamental right at stake in this case, "the Equal Protection Clause requires only that the classification rationally further a legitimate [governmental] interest." *Id.* at 2331–32.

41. Plaintiffs assert the Ordinance makes two distinctions which lack a rational basis. First, §§ 31–310 and 311 single out Industrial, Commercial, Institutional, and Multi–Family Residential facilities and require them to obtain a permit, but do not apply to other entities that cause similar storm water problems for the City, *e.g.*, airports, public utilities, sports coliseums, and railroads. However, the record is devoid of any evidence that any airport, public utility, sports coliseum, or railroad has been treated differently than any Plaintiff. In fact, these entities seem to fall within the broad definitions of Industrial, Commercial, and Institutional provided by § 31–302. Therefore, §§ 31–310 and 311 should apply to these entities. The only evidence in the record of an exemption relates to an airport which has an NPDES permit. (Court File No. 57, pp. 99–100). This exemption arises from § 31–310(a), which requires only entities that do not have an NPDES permit to obtain a CSWD permit. Accordingly, the Court finds the distinctions created by §§ 31–310 and 311 have a rational basis and Plaintiffs' facial equal protection challenge fails.

42. Second, Plaintiff Dayton Boulevard contends the City required it to install an oil/water separator at its own expense, but supplied a separator for Plaintiff Vickery Brothers. As previously noted, Scott required Dayton Boulevard to install a separator because he could not install a separator in an existing right-of-way and cure the problem; the storm water discharged off the back of the property. Therefore, Scott could not waive the separator requirement pursuant to the 1994 amendment as he had done in other cases. The Court finds there is a rational basis for the distinction created by the 1994 amendment. Therefore, the Court will not invalidate the Ordinance on equal protection grounds.

43. *The Ordinance violates the SWMA by imposing taxes instead of fees.* According to Plaintiffs, the SWMA, § 68–

221–1107, authorizes municipalities to collect fees, not taxes. Plaintiffs argue the charges imposed under the Ordinance, §§ 31–350 to –359, are actually taxes. Urging the Court to consider the "real nature" of the charges, Plaintiffs assert five factors reveal the charges are actually taxes: (a) the way the charges are assessed; (b) the lack of direct benefit to Plaintiffs; (c) the term the City uses to describe the charges; (d) the absence of a reasonable relationship between the sums collected under the Ordinance and the expenses reasonably required for projects authorized by the Ordinance; and (e) the purposes for which the charges will be used. (Court File No. 59, pp. 22–23).

44. First, Plaintiffs argue the revenues collected under the Ordinance are grossly disproportionate to the actual cost of constructing and maintaining the City's storm water system. As discussed previously, this argument is without merit. *See supra* ¶ 11.

45. Second, Plaintiffs assert the charges are taxes because they benefit the general populous and do not directly or uniquely benefit Plaintiffs. More specifically, Plaintiffs assert they are located outside the City's downtown area and receive no special or direct benefit from the City's CSO system, which receives one-half of the funds collected under the Ordinance. Again, the Court has previously determined the CSO is part of the City's storm water system. *See supra* ¶¶ 9–10. Moreover, Peter Yakimowich's testimony indicated there is a direct correlation between the amount of storm water runoff from a particular piece of property and the City's cost of managing the water. Plaintiffs cite no specific evidence indicating the fees they were charged do not correlate to their use of the City's storm water system.

46. Third, Plaintiffs note the Ordinance uses the term "tax" in three provisions. Section 31–354 states, "The annual storm water charge, fee or tax shall be based upon the land area, the category of land use, and the intensity development fac-

tor...." Section 31–353(d) requires each bill for storm water charges to state: **"THIS TAX HAS BEEN MANDATED BY CONGRESS."** Section 31–353(b) indicates: "The storm water charge shall be designated as a separate item on the property tax bill." Considering the "real nature" of the fees as Plaintiffs suggest, the Ordinance's references to "tax" do not transform the fee into a tax. Moreover, the language required by § 31–353(d) is mandated by the SWMA, § 68–221–1112. Rather than support Plaintiffs' contention the Ordinance violates the SWMA by imposing a tax, § 31–353(d) demonstrates compliance with a specific provision of the SWMA.

47. Fourth, Plaintiffs contend the charges imposed by the Ordinance are taxes because the revenue collected is used to construct and expand storm water facilities rather than only to defray expenses of operating the facilities. Initially, the Court notes Peter Yakimowich testified the quantity and rate of storm water discharge determine the size of the facilities needed, as well as the attendant maintenance associated with those facilities. More importantly, the Court notes the SWMA provides:

> All municipalities *constructing*, operating, or maintaining storm water or flood control facilities are authorized to establish a graduated storm water user's fee which may be assessed and collected from each user of the storm water facilities provided by the municipality. These fees shall be reasonable in amount and used exclusively by the municipality for purposes set forth in this part. Such a graduated storm water user's fee shall be based on actual or estimated use of the storm water and/or flood control facilities of the municipality, and *each user or user class shall only be required to pay its proportionate share of the construction*, administration, operation and maintenance *including replacement costs of such facilities* based on the user's actu-

al or estimated proportionate contribution to the total storm water runoff from all users or user classes. To ensure a proportionate distribution of all costs to each user or user class, the user's contribution shall be based on factors such as the amount of impervious area utilized by the user, the water quality of user's storm water runoff or the volume or rate of storm water runoff. Users whose storm water runoff is not discharged into or through the storm water and/or flood control facilities of the municipality shall be exempted from payment of the graduated storm water user fee authorized by this section....

Tenn.Code Ann. § 68–221–1107(a). Therefore, use of revenues collected to construct or expand facilities does not violate the SWMA as Plaintiffs suggest.

48. Finally, Plaintiffs argue the Ordinance charges taxes rather than fees because Plaintiffs do not receive any services in return for payment of the charges. According to Plaintiffs, they do not receive any services because the revenue generated is primarily spent to improve the downtown CSO, not on storm water projects in the specific areas where Plaintiffs' property is located. As the Court has determined several times, the CSO is part of the City's storm water system. Because the fees imposed are based upon use of the storm water system, the Court finds Plaintiffs' argument without merit.

49. *The taxes imposed by the Ordinance violate the Tennessee Constitution because they are not uniform and do not bear a reasonable relationship to the costs of the City storm water system.* Plaintiffs contend the Ordinance violates Article II, § 29 of the Tennessee Constitution because it imposes a non-uniform tax and the revenue collected bears no reasonable relationship to necessary expenses. Having determined the Ordinance imposes a fee, not a tax, the Court need not address this argument.

50. *The Ordinance violates the separation of powers doctrine of the Tennessee Constitution.* Plaintiffs argue the Ordinance violates Article II, §§ 1–2 of the Tennessee Constitution by delegating power to the Manager and Board without attendant standards or criteria governing application and enforcement of the Ordinance.

51. According to Plaintiffs, the separation of powers doctrine requires legislative bodies to "establish adequate standards to guide the agency [or official] in its exercise of the delegated authority, and ... there [must] be sufficient safeguards to prevent arbitrary action by the agency [or official]." *State v. Edwards,* 572 S.W.2d 917, 919 (Tenn.1978). Plaintiffs assert the requisite safeguards normally include "standards, criteria and definite limits" governing the exercise of delegated authority. *State v. Word,* 508 S.W.2d 539, 545 (Tenn. 1974).

52. As the Court impliedly indicated in discussing Plaintiffs' due process claims, *supra* ¶¶ 33–36, the Ordinance does not violate the separation of powers doctrine. The Ordinance contains sufficient definitions to guide application and enforcement and allows appeals from the decisions of the Manager and the Board. Therefore, there are sufficient safeguards to prevent arbitrary action, and Plaintiffs' final argument is without merit.

For all the aforementioned reasons, the Court **ORDERS** the Clerk of Court to enter judgment in favor of the City and **CLOSE** this case.

**SO ORDERED.**